**JET LINE SERVICES, INC.**

v.

**M/V MARSA EL HARIGA et al.**

**Civ. No. Y-78-80.**

United States District Court,
D. Maryland.

Nov. 27, 1978.

Charles M. Tatelbaum, Baltimore, Md., for plaintiff.

Richard R. Jackson, Jr., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

I. THE FACTS

On January 17, 1978, Jet Line Services, Inc. ("Jet Line") intervened in a pending in rem action before this Court, *Promet Ma-*

*rine Services Corp. v. ELRAKWA*, Civil No. Y-78-62, to recover $11,283.29 for services rendered from October 8 to October 10, 1977 in connection with the cleanup of an oil spill from the M/V ELRAKWA. Also, on or about January 17, 1978, Jet Line filed its own complaint in this Court against the M/V ELRAKWA in rem. This suit was for breach of contract arising out of the alleged failure to pay for the services rendered the M/V ELRAKWA in August, 1977. Subsequently, the claims by Promet and Jet Line against the M/V ELRAKWA were settled, and, accordingly, the arrest of the M/V ELRAKWA in Civil Action No. Y-78-62 was released and that case is now moot.

On or about January 17, 1978, Jet Line filed a suit in this Court against the M/V MARSA EL HARIGA, in rem, and National Oil Company of Libya, erroneously referred to in the Complaint as the alleged owner of the M/V MARSA EL HARIGA. The Complaint sought to recover $91,310.00 for services allegedly performed with regard to the discharge of the M/V MARSA EL HARIGA in Sandwich, Massachusetts in August, 1977. When the suit was instituted, Jet Line prayed that the M/V ELRAKWA, which was still present within the District of Maryland and under arrest by virtue of the previous suit, Civil Action No. Y-78-62, be attached by issuance of process of maritime attachment and garnishment against the defendant, National Oil Company of Libya, and that the interest of the National Oil Company of Libya in the M/V ELRAKWA be attached. Accordingly, the United States Marshal attached the M/V ELRAKWA.

Upon discovering that the National Oil Company of Libya did not in fact own the M/V ELRAKWA, plaintiff moved to amend its complaint to name the General National Maritime Transportation Company ("GNMTC") as the proper owner of the M/V ELRAKWA. This motion was granted by Judge Harvey on January 19, 1978.

Shortly after the attachment of the M/V ELRAKWA by the Marshal, defendant GNMTC, through special appearance before this Court, moved to vacate the attachment

of the vessel on the grounds that it is a corporation organized and created under the laws of The Socialist People's Libyan Arab Jamahiriya ("Libya"), and, under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1602-1611 (the "Immunities Act"), any arrest or attachment of the vessel was improper and void. Attached to the original motion to vacate was the statement of Shaban F. Gashut, Chargé d'Affaires of the Libyan Embassy in Washington, D.C., to the effect that GNMTC was a corporation organized under the laws of the Libyan government and has owned the M/V ELRAKWA and M/V MARSA EL HARIGA continuously from 1977 to the present.

On January 20, 1978, Judge Harvey conducted a hearing on the motion to vacate, at which time he denied the motion because, inter alia, Mr. Gashut's statement was not in proper affidavit form, lacked proper authentication, and did not specifically state that GNMTC was an "organ" of the Libyan government. Judge Harvey also ruled that the motion could be renewed once these deficiencies were cured.

On May 15, 1978, GNMTC, appearing specially before this Court in accordance with Rule E(8) of the Supplemental Rules of Federal Civil Procedure for Certain Admiralty and Maritime Claims, moved this Court to vacate and release the security posted pursuant to the Immunities Act, *supra*. The M/V ELRAKWA had already been released from attachment on the basis of a Letter of Undertaking to Jet Line signed by The West of England Ship Owners Mutual Protection and Indemnity Association (Luxembourg) ("West of England"), defendant's indemnitor, in which West of England agreed to appear on behalf of the owner of the M/V ELRAKWA in connection with this case and to pay and satisfy any final judgment entered in favor of Jet Line up to and not exceeding $102,600.00. GNMTC also advanced a separate ground for contesting the arrest and attachment, namely, that the procedure was defective and void in that it violated the due process clause of the Fifth Amendment and was not

in accord with recent decisions of the U. S. Supreme Court dealing with prejudgment arrest and attachment of property.[1] To support its claim of immunity under the Immunities Act, GNMTC again submitted a statement from Mr. Shaban F. Gashut certifying and attesting to the effect that GNMTC: (1) is an entity of the Socialist People's Libyan Arab Jamahiriya, (2) is a corporation organized and created under the laws of Libya, is a separate legal person, and has offices located in Tripoli, (3) is an "organ" of Libya's government, (4) is not a citizen of the United States and was not created under the laws of any third country, and (5) is the sole owner of the M/V ELRAKWA and M/V MARSA EL HARIGA, and owned said vessels continuously during 1977 and up to the present. Accompanying this statement were certified statements from Stuart W. Rockwell, Deputy Chief of Protocol at the Department of State, indicating that Mr. Gashut's signature on his statement is, to the best of his knowledge, the same signature appearing on the official form submitted by the Libyan Embassy notifying the State Department of his appointment as a foreign diplomatic officer. Mr. Rockwell also stated that according to official State Department records, Mr. Gashut has been duly notified to the Department of State since September 25, 1975, as Counselor, Chargé d'Affaires ad interim at the Libyan Embassy, and in that capacity he acts provisionally as head of the mission.

On May 26, 1978, GNMTC, appearing again before this Court, moved to dismiss the complaint pursuant to F.R.Civ.P. 12. The memorandum, various documents and affidavits accompanying this motion stated that GNMTC had agreed to pay Jet Line no more than $18,000 for its services, and that the balance of its claim, the $74,480.75, must be obtained elsewhere. Defendant argued that in August, 1977, the M/V MARSA EL HARIGA was chartered to Messrs.

Brega Naft who were represented in the United States and in Boston, Massachusetts, by their agents, SS&Y–TTT Ship Agencies. The documents submitted by GNMTC purported to establish that the contract pursuant to which claim is made by Jet Line in this case, if any, was made, if at all, by and between Jet Line and SS&Y–TTT Ship Agencies, as agents for Brega Naft, charterer of the M/V MARSA EL HARIGA. According to the defendant, SS&Y–TTT was neither an agent of GNMTC nor was it authorized to act on behalf of GNMTC with regard to the discharge of oil from the M/V MARSA EL HARIGA at Sandwich, Massachusetts in August, 1977. GNMTC submitted numerous telexes in support of its assertion that it was not a party to any contract between plaintiff and Brega Naft. As a result, defendant moves to dismiss claiming that in bringing a suit by writ of foreign attachment, Jet Line has sued a party with whom it has never contracted and that the proper action, if any, lay against SS&Y–TTT and/or Brega Naft, the principal of SS&Y–TTT. GNMTC claims it signed no contract with plaintiff nor authorized SS&Y–TTT to bind it in any contract with plaintiff.

Plaintiff has responded opposing both the motion to vacate and release security and the motion to dismiss. Specifically, plaintiff opposes these motions on four grounds: (1) that there are numerous factual discrepancies at issue, (2) that defendants fail to establish the applicability of the Immunities Act, (3) that the Letter of Undertaking is a binding private contract between Jet Line and a non-party to the litigation (i. e., West of England), and (4) that the arrest and attachment of the M/V ELRAKWA violated no constitutional provisions.

## II. DISCUSSION

Sovereign immunity is a doctrine of international law under which domestic

---

1. Claimant refers specifically to *North Georgia Finishing, Inc. v. Di-Chem*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), and *Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agencies, Ltd.*, 450 F.Supp. 447

(W.D.Wash., 1978). The latter case declared admiralty rule B1, "Attachment and Garnishment: Special Provisions," to be unconstitutional.

courts, given the proper circumstances, will relinquish jurisdiction over a foreign state. *See generally* N. E. Leech, C. T. Oliver, J. M. Sweeney, The International Legal System 306–91 (1973). Sovereign immunity may be distinguished from diplomatic immunity which involves a suit brought against an individual diplomat. Chief Justice Marshall first recognized the doctrine of sovereign immunity in American law in *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), where he sustained a plea of immunity in light of support shown by the executive branch for such immunity by recognizing that affording immunity in such circumstances found support in the general law and practice of nations. In this century, however, the Supreme Court began to rely on the policies and practices of the Department of State and less and less on the law of nations in resolving particular sovereign immunity questions. *See* Foreign Sovereign Immunities Act of 1976, House Rep. No.94–1487, Sept. 9, 1976, to accompany H.R. 11315, *reprinted* in [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6606. The high watermark of this trend was reached in *Ex Parte Peru,* 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943), and *Mexico v. Hoffman,* 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945).

Until the passage of the Immunities Act in 1976, judges were generally disposed to deny sovereign immunity claims which had not been "recognized and approved" by the Department of State unless it was clear that the particular activity came within one of the categories of strictly political or public acts about which sovereigns were typically sensitive. These acts were limited primarily to the following categories: (1) internal administrative acts such as the expulsion of aliens, (2) legislative acts such as

naturalization, (3) acts concerning the armed forces, (4) acts relating to diplomatic activity, and (5) public loans. *Victory Transport, Inc. v. Comisaria General de Abastecimientos v. Transportes,* 336 F.2d 354 (2d Cir. 1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). Since 1952, the United States has approached sovereign immunity questions "restrictively." The State Department would not suggest immunity where a sovereign was acting in a commercial capacity, *i. e., jure gestionis,* but would do so in connection with strictly sovereign activities, *i. e., jure imperii.* The basis for this policy distinction was put forward in a letter from Jack Tate, Legal Adviser to the State Department, to the Attorney General, 26 Dep't St.Bull. 984 (1952).

The situation whereby courts would defer to executive determinations of sovereign immunity claims frequently led to results which were inconsistent with the restrictive theory of sovereign immunity. For examples of cases involving executive determinations, see *Pan American Tankers Corp. v. Republic of Vietnam,* 291 F.Supp. 49, 51 (S.D.N.Y.1968) and the cases cited therein. *See also Southeastern Leasing Corp. v. Stern Dragger Belogorsk, etc.,* 493 F.2d 1223 (1st Cir. 1974); *Isbrandtsen Tankers, Inc. v. President of India,* 446 F.2d 1198 (2d Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 452, 30 L.Ed.2d 369 (1971).

A brief outline of the origins and development of sovereign immunity, including an analysis of the "policy" reasons which frequently affected sovereign immunity decisions by the courts, may be found in Note, *Sovereign Immunity in the Supreme Court: Using the Certiorari Process To Avoid Decisionmaking,* 16 Va.J.Int'l L. 903, 904–09, 920–24 (1976).[2]

---

2. The judicial hostility to executive-determined sovereign immunity was vehemently articulated by Justice Musmanno of the Pennsylvania Supreme Court in his dissenting opinion in *Chemical Natural Resources, Inc. v. Venezuela,* 420 Pa. 134, 215 A.2d 864, *cert. denied,* 385 U.S. 822, 37 S.Ct. 50, 17 L.Ed.2d 60 (1966):

"The sovereign immunity doctrine . . . is no longer a healthy manifestation of socie-

ty. It is, in fact, an excrescence on the body of the law, it encourages irresponsibility to world order, it generates resentments and reprisals. Sovereign immunity is a stumbling block in the path of good neighborly relations between nations, it is a sour note in the symphony of international concord, it is a skeleton in the parliament of progress, it encourages government toward chicanery, de-

The new Immunities Act of 1976 was intended, then, to accomplish two main goals. First, it codified the restrictive theory of sovereign immunity both in terms of its general application as well as all relevant exceptions:

§ 1602. Findings and declaration of purpose

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."

Section 1605 enumerates those general exceptions to the jurisdictional immunity of a foreign state. Second, it was to elevate the judiciary by according it primary decision-making responsibility in the field of sovereign immunity. "Only the exceptions to immunity allowed by the law will be recognized, and only courts will determine the applicability of those exceptions." Note, *International Law—Act of State Doctrine—Foreign Sovereign Immunities Act of 1976—Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), 18 B.C.Ind. & Comm.L.R. 318, 345 (1977). *See also Martropico Compania Naviera S.A. v. Pertamina,* 428 F.Supp. 1035, 1037 (S.D.N.Y.1977). The legislative history of the Immunities Act specifically recognized these objectives:

"First, the bill would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.

"Second, the bill would insure that this restrictive principle of immunity is applied in litigation before U.S. courts. At present, this is not always the case. Today, when a foreign state wishes to assert immunity, it will often request the Department of State to make a formal suggestion of immunity to the court. Although the State Department espouses the restrictive principle of immunity, the foreign state may attempt to bring diplomatic influences to bear upon the State Department's determination. A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity. As was brought out in the hearings on the bill, U.S. immunity practice would conform to the practice in virtually every other country—where sovereign immunity decisions are made ex-

ception and dishonesty. Sovereign immunity is a colossal effrontery, a brazen repudiation of international moral principles, it is a shameless fraud." *Id.* at 194, 215 A.2d at 893.

The dissent argued some ten years before the passage of the Immunities Act that since the doctrine of sovereign immunity was judicially created, the courts should have the final say in its specific application.

clusively by the courts and not by a foreign affairs agency." [1976] U.S.Code Cong. & Admin.News, p. 6605.

The Immunities Act would also, for the first time in U.S. law, "provide a statutory procedure for making service upon, and obtaining in personam jurisdiction over, a foreign state." *Id.* at 6606. This development would remove the necessity of seizing and attaching a foreign state's property which always ran the risk of creating inconvenience and ill feelings. Finally, by conforming the execution immunity rules more closely to the jurisdiction immunity rules so as to restrict broad immunity from execution, the Immunities Act was to remedy, in part, the predicament of a plaintiff who had obtained a judgment against a foreign state but found execution difficult, if not impossible. *See generally A Symposium on the Enforcement of Foreign Judgments and Arbitral Awards,* 17 Va.J.Int'l L. 361 (1977).

Section 1604 establishes the general immunity of a foreign state from jurisdiction:

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

According to the legislative history, Section 1604 provides the "only basis" under which a foreign country could claim immunity from the jurisdiction of any Federal or State court. [1976] U.S.Code Cong. & Admin. News, p. 6606. The actual procedure by which a foreign government may seek to claim such immunity is likewise explained in Section 1604's legislative history:

"since sovereign immunity is an affirmative defense which must be specially pleaded, the burden will remain on the foreign state to produce evidence in support of its claim of immunity. Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state—that is, an act not within the exceptions of sections 1605–1607. Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state." [1976] U.S.Code Cong. & Admin.News, p. 6616.

Immunity may be extended to a "foreign state," defined in Section 1603(a) to include (except in Section 1608) "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *See Gray v. Permanent Mission of the People's Republic of the Congo to the United Nations,* 443 F.Supp. 816, 820 (S.D.N.Y.1978). Under Section 1603(b) "agency or instrumentality of a foreign state" is defined as constituting any entity

"(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country."

■ In the instant case, Libya (or GNMTC) bears the burden of producing evidence to support its claim of sovereign immunity. To accomplish this, its embassy in Washington has responded with a statement by Shaban F. Gashut, Chargé d'Affaires ad interim who has certified and attested to the status of GNMTC and its ownership of the M/V MARSA EL HARIGA and the M/V ELRAKWA. In assessing these claims, this Court takes recognition of the recent ruling by Judge Duffy which, inter alia, noted that GNMTC was a wholly-owned Libyan entity which had succeeded the General Maritime Transport Organization in 1970. *Carey v. National Oil Corp.,* 453 F.Supp. 1097, 1099 (S.D.N.Y.1978). Of further interest is Judge Duffy's recogni-

tion that the National Oil Company, the party initially and erroneously sued by the plaintiff in the instant case, was also a corporation owned by the Libyan government and was created in 1970 with powers to "engage in all facets of the petroleum business." *Id.*

In response to a request by defendant for admission of certain facts, Jet Line has refused to admit that GNMTC is an entity of the Libyan government, that GNMTC is a corporation organized and created under the laws of Libya, that GNMTC is an "organ" of the Libyan government, that GNMTC is not a citizen of the United States and was not created under the laws of any third country, as well as a number of other matters relating to the status of the vessels in question vis-à-vis GNMTC, SS&Y–TTT Ship Agencies, and Brega Naft. Insofar as the denials about GNMTC are concerned, the obvious purpose behind plaintiff's responses is to defeat any claim by GNMTC that it is entitled to sovereign immunity as an "organ" or "agency or instrumentality" of the Libyan government.

Under the terms of the Immunities Act, this Court must determine without reference to political considerations the claims of sovereign immunity advanced by GNMTC. *See Edlow International Co. v. Nuklearna Elektrarna Krsko,* 441 F.Supp. 827 (D.C.D.C.1977). In order to make such an assessment, a court must consider the affidavits and other material submitted by a government in establishing its entitlement to sovereign immunity. With regard to raising such claims of immunity generally, see 45 Am.Jur.2d, International Law, § 54 (1969), and 2 Am.Jur.2d, Admiralty, §§ 36–41 (1962). Although the second Gashut "affidavit" does not comply strictly with the suggested procedural forms for such submissions, *see, e. g.,* 10 Fed.Proc. Forms (Foreign Relations) §§ 32:51 through 32:53 (1977), and lacks certain other indicia such as a date and notarization, this Court finds that in light of the supporting documents from the Department of State which both describe the "affidavit" and verify Mr. Gashut's status at the Libyan Embassy in

Washington, as well as Judge Duffy's findings in *Carey, supra,* Mr. Gashut's statement is adequate to prove the allegations made therein. Moreover, there is authority for the view that a court may take judicial notice of an entity's sovereign character. *Puente v. Spanish National State,* 116 F.2d 43 (2d Cir. 1940), *cert. denied,* 314 U.S. 627, 62 S.Ct. 57, 86 L.Ed. 504 (1941). *See also* Rule 902(3) of the Federal Rules of Evidence. Additionally, the Court notes Exhibit G, submitted in connection with Bertram E. Snyder's affidavit in support of plaintiff's opposition to defendant's motion to dismiss and motion to vacate security. Exhibit G is a photocopied page from the 1976–1977 *Lloyd's Register of Ships* and clearly shows that the M/V MARSA EL HARIGA is owned by GNMTC. Consequently, unlike the situation in *Pan American Tankers Corp. v. Republic of Vietnam,* 291 F.Supp. 49 (S.D.N.Y.1968), where the record was devoid of any facts probative as to whether two corporate defendants were "creatures of The Republic of Vietnam," 291 F.Supp. at 52, this Court is able to find that defendant has produced such prima facie evidence of immunity and that plaintiff, then faced with the burden of going forward, has failed to produce evidence establishing that sovereign immunity should not be granted. In terms of meeting the statutory requirements of Section 1603(b), GNMTC has demonstrated with regard to its being an "agency or instrumentality of a foreign state" that it is a separate legal person which functions as an organ of a foreign state or political subdivision thereof, and that it is not a citizen of the United States nor created under the laws of any third country.

While GNMTC would, for the reasons explained above, fit within the prerequisites for receiving sovereign immunity, Section 1605(b) codifies a general exception to sovereign immunity in cases involving maritime liens:

"(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a

maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b)(1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam claim against the foreign state which at that time owns the vessel or cargo involved: *Provided*, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b)(1) of this section."

The legislative history is once more instructive on the meaning of this exception:

"(b) *Maritime liens.*—Section 1605(b) denies immunity to a foreign state in cases where (i) a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of that foreign state, (ii) the maritime lien is based upon a commercial activity of the foreign

state, and (iii) the conditions in paragraphs (1) and (2) of section 1605(b) have been complied with.

"The purpose of this subsection is to permit a plaintiff to bring suit in a U.S. district court arising out of a maritime lien involving a vessel or cargo of a foreign sovereign without arresting the vessel, by instituting an in personam action against the foreign state in a manner analogous to bringing such a suit against the United States. Cf. 46 U.S.C. 741, *et seq.* In view of section 1609 of the bill, section 1605(b) is designed to avoid arrests of vessels or cargo of a foreign state to commence a suit. Instead, as provided in paragraph (1), a copy of the summons and complaint must be delivered to the master or other person having possession of the vessel or cargo (such as the second in command of the ship)." [1976] U.S. Code Cong. & Admin.News, p. 6620.

As noted above, Jet Line arrested and attached the M/V ELRAKWA only to discover shortly thereafter that the ship belonged to GNMTC rather than the National Oil Company. Jet Line then released the ship on the basis of a Letter of Undertaking signed by West of England. This Letter was submitted to this Court by letter dated January 23, 1978 from plaintiff's Baltimore counsel and said in part:

"Pursuant to the terms of the agreement reached between counsel, the letter of undertaking would be substituted as collateral for the vessel, the owner of the vessel, General National Maritime Transport Company, will enter its appearance and no longer object to the jurisdiction of this Count [sic] and the two cases will then be tried on their respective merits."

Plaintiff, however, ignores the actual wording of the Letter of Undertaking, the last paragraph of which reads:

"This letter of undertaking shall apply vessel lost or not lost and is given entirely without prejudice to any rights or defenses which may be available to the M/V Elrakwa, and/or her claimant, and/or General under any statutes or rules in

effect, none of which are regarded to be waived. This letter is not to be considered to be binding on John H. West, III or the law firm of Ober, Grimes & Shriver but is to be binding only on The West of England Ship Owners Mutual Protection and Indemnity Association (Luxemborg)."

Although GNMTC may now have entered its appearance, such entry cannot be equated with a waiver or forfeiture of its sovereign immunity claims. Final resolution of this case depends, in fact, upon the relationship between plaintiff's arrest and attachment of the M/V ELRAKWA and the exception to jurisdictional immunity for maritime liens codified in Section 1605(b).

▮ One of the goals of the Immunities Act was to end the inconvenience associated with arresting and attaching property of a foreign state in order to obtain jurisdiction:

"Such attachments can also give rise to serious friction in United States' foreign relations. In some cases, plaintiffs obtain numerous attachments over a variety of foreign government assets found in various parts of the United States. This shotgun approach has caused significant irritation to many foreign governments.

"At the same time, one of the fundamental purposes of this bill is to provide a long-arm statute that makes attachment for jurisdictional purposes unnecessary in cases where there is a nexus between the claim and the United States. Claimants will clearly benefit from the expanded methods under the bill for service on a foreign state (sec. 1608), as well as from the certainty that section 1330(b) of the bill confers personal jurisdiction over a foreign state in Federal and State courts as to every claim for which the foreign state is not entitled to immunity. The elimination of attachment as a vehicle for commencing a lawsuit will ease the conduct of foreign relations by the United States and help eliminate the necessity for determinations of claims of sovereign immunity by the State Department." [1976] U.S.Code Cong. & Admin.News, p. 6626.

The appropriate new procedures for obtaining such jurisdiction are explained in Section 1605(b)(1) and (2) and preclude attachment as a means for initiating a lawsuit.[3] Accordingly, when the foreign state reveals its interest in a ship or its cargo which has been mistakenly arrested, the arrest or attachment must be dissolved immediately. The Letter of Undertaking between West of England and Jet Line was "[i]n consideration of [Jet Line] releasing the M/V ELRAKWA, which vessel was arrested on or about January 16, 1978, and from refraining from arresting or attaching any other vessels, funds or property belonging to General National Maritime Transport Co. . . . ." Oddly enough, West of England must not have been aware of the provisions of the Immunities Act. No agreement such as that contained in the Letter of Undertaking would have been necessary since the arrest of the M/V ELRAKWA was improper in the first place. The attachment would have had to be dissolved under 28 U.S.C. § 1609 as soon as Libya made known its interest in the vessel. The only other explanation for the Letter of Undertaking was as a means to expedite the release of the ship so that it could continue on its commercial voyage.

According to the legislative history of the Immunities Act, "[i]f . . . the vessel or its cargo is arrested or attached, the plaintiff will lose his in personam remedy and the foreign state will be entitled to immunity—except in the case where the plaintiff was unaware that the vessel or cargo of a foreign state was involved." [1976] U.S.Code Cong. & Admin.News, p.

---

**3.** Under the holding in *Weilamann v. Chase Manhattan Bank*, 21 Misc.2d 1086, 192 N.Y. S.2d 469 (Sup.Ct.N.Y.1959), it was recognized that one could attach the property of a foreign government for jurisdictional reasons where under international law a foreign government is not immune from suit, and where the property located in the United States was of a commercial nature. While such attachment could serve to obtain jurisdiction, it could not, however, be retained to satisfy a judgment as property of a foreign sovereign is traditionally immune from execution.

6620. The legislative history furthermore explains that instances in which a party would be unaware of the involvement of a foreign sovereign would be rare:

"This would be a rare case because the flag of the vessel, the circumstances giving rise to the maritime lien, or the information contained in ship registries kept in ports throughout the United States should make known the ownership of the vessel in question, if not the cargo. By contrast, evidence that a party had relied on a standard registry of ships, which did not reveal a foreign state's interest in a vessel, would be prima facie evidence of the party's unawareness that a vessel of a foreign state was involved. More generally, a party could seek to establish its lack of awareness of the foreign state's ownership by submitting affidavits from itself and from its counsel. If, however, the vessel or cargo is mistakenly arrested, such arrest or attachment must, under section 1609, be immediately dissolved when the foreign state brings to the court's attention its interest in the vessel or cargo and, hence, its right to immunity from arrest." [1976] U.S.Code Cong. & Admin.News, pp. 6620–21.

In its own initial unamended complaint, plaintiff describes itself as being "in the business among other things of furnishing services to merchant vessels." Presumably, since plaintiff furnishes such services on a professional basis, it was undoubtedly aware of the possible complications which can arise when its customers are foreign-owned rather than U.S.-owned vessels. Although plaintiff did mistakenly name the wrong party as a defendant, this error is not indicative of plaintiff's not knowing that a foreign state might be involved as both the National Oil Company and GNMTC are organs of the Libyan government.

Mindful of the legislative history behind the Immunities Act stating that a plaintiff will lose his in personam remedy if he wrongfully arrests or attaches a ship belonging to a foreign state "except . . . where the plaintiff was unaware that the vessel or cargo of a foreign state was involved," this Court directed the parties to this litigation to submit memoranda and any additional supporting materials addressing in detail the extent to which plaintiff knew, or should have known, that the seized vessel was the property of a foreign subject. 28 U.S.C. § 1605(b)(1). Plaintiff responded with an affidavit from its President, Robert Dee, who, inter alia, stated that "[w]hen Jet Line does work for a foreign flag vessel, it relies on the vessel's agent for information concerning ownership, not the vessel's flag." Consequently, Dee maintains that Jet Line had no reason to know of the M/V ELRAKWA's claim of sovereign immunity. Remarking that "Jet Line is not particularly concerned with the flag the vessel is flying, or the registered name of the owner," Dee further observed that the ship's agent never advised Jet Line that the ships belonged to a foreign sovereign.[4] Finally, Dee unequivocally states that he was wholly unfamiliar with the existence of the Immunities Act and its requirements:

"Jet Line has no in house legal counsel and neither I nor any of the officers of Jet Line had ever heard of the Foreign Sovereign Immunities Act prior to this litigation.

"I have no reason to investigate who actually owns the vessels Jet Line works on as long as I am convinced that the vessel has a reputable agent, appropriate insurance and I hear nothing from the agent to indicate that the vessel will not be able to pay for the services rendered."

It has frequently been stated that all persons are presumed to know the law of the land, regardless of whether the law involved is state or federal. *See generally, Lawder v. Stone,* 187 U.S. 281, 293, 23

**4.** To support his claim of ignorance as to the ships' ownership, Dee refers to the following factors: the M/V ELRAKWA's captain was not a Libyan; the ship's officer and crew did not wear military uniforms; the vessels were not painted gray and lacked guns; and wives and children were on board. While these factors together may have misled plaintiff as to the true ownership of the ship in question, the Immunities Act does not provide that these factors may be taken into account.

S.Ct. 79, 47 L.Ed. 178 (1902); *Parsons v. District of Columbia*, 170 U.S. 45, 50–51, 18 S.Ct. 521, 42 L.Ed. 943 (1898); *United States v. Realty Co.*, 163 U.S. 427, 437–39, 16 S.Ct. 1120, 41 L.Ed. 215 (1896); and *Banigan v. Bard*, 134 U.S. 291, 295, 10 S.Ct. 565, 33 L.Ed. 932 (1890). Perhaps one of the most commonly recognized truisms of American legal jurisprudence is that ignorance of the law does constitute a proper defense. *Edwards v. United States*, 334 F.2d 360, 366 (5th Cir. 1964), *cert. denied*, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965). More importantly, parties engaging in business or commercial transactions are conclusively presumed to know the law. *See, e. g., Mammoth Oil Co. v. United States*, 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137 (1927). The legislative history behind the Immunities Act recognizes that where a party attaching a ship could not have known that the ship's owner was a foreign sovereign, that party's in personam jurisdiction over the sovereign will not be lost. Such cases, however, are clearly recognized to be "rare."

■ Responding to the Court's request for more information as to the actual knowledge plaintiff had or should have had as to the identity of the owner of the M/V ELRAKWA and the M/V MARSA EL HARIGA, defendant has moved to dismiss plaintiff's action pursuant to section 1605(b)(1) of the Immunities Act. In support of its motion, defendant points to several publications, readily available to interested parties throughout the shipping trade, which indicate that plaintiff should have known that a sovereign entity's vessel was involved. For example, a recent excerpt from *Lloyd's Shipping Index* states that the owner of the M/V MARSA EL HARIGA and M/V ELRAKWA is "G.N.M.T.C." which stands for General National Maritime Transport Co. of Tripoli, Libya. Both vessels are shown to fly the Libyan flag. Furthermore, an excerpt from the *Lloyd's Register of Shipping List of Shipowners* for 1977–78 says, with reference to G.N.M.T.C., "See government of Libya." Finally, an excerpt from *Lloyd's Register of Ships, 1976–1977*, published yearly, identifies GNMTC as the M/V MARSA EL HARI-

GA's owner. With regard to the M/V EL-RAKWA, defendant explains that no such similar entry exists since the M/V ELRAKWA was not built until 1977. Moreover, defendant notes that plaintiff has already conceded the presence of common ownership between the two ships. As defendant argues, these entries would appear to constitute "the information contained in ship registries kept in ports throughout the United States [which] should make known the ownership of the vessel in question." [1976] U.S.Code Cong. & Admin.News, p. 6620.

To the extent that plaintiff expects to prevail upon whatever maritime liens which it might claim in the future, it will now have reason to investigate who actually owns a maritime vessel before it takes action to arrest or attach a ship. While it is perhaps unfortunate that plaintiff should lose on an apparent technicality, such a "technicality" is firmly rooted in the sound public policy as to foreign sovereign immunities. To allow plaintiff to prevail despite its self-proclaimed ignorance of the law would be to encourage a policy of "attach first, ask later," and such an attitude would be in flagrant derogation of the policies behind the Immunities Act. Notice of the "new" U.S. immunities policy was contained in a letter from Monroe Leigh, Legal Adviser to the Department of State, to the Attorney General, Dep't of State Public Notice No. 507 (November 10, 1976), and reprinted in the 1976 compilation of *American Maritime Cases* at page 2362. The Immunities Act had been effective since January 19, 1977, almost exactly one year to the day before the events in this suit began. This Court cannot excuse plaintiff's failure to comply with codified U.S. law, and as a consequence, plaintiff must lose its in personam remedy in accordance with the provisions of the Immunities Act.

Plaintiff also maintains that an agency issue is presented insofar as the services provided to the M/V MARSA EL HARIGA were authorized by the owner's agents and that, correspondingly, "the question of the agents' authority or for whom they were acting cannot be resolved by affidavits." Similarly, plaintiff argues that the Letter

of Undertaking constitutes a binding private contract and should not be "vacated" as defendant requests. Plaintiff argues that:

"The attempt to vacate the letter of undertaking constitutes nothing more than a request for the Court's advisory opinion on the binding nature of a private contract between Jet Line and defendants' protection and indemnity carrier, the West of England.

"After Jet Line obtained *in rem* and *in persònam* jurisdiction by seizing the ELRAKWA and after defendants' efforts to release the vessel failed, defendants obtained the immediate release of the ELRAKWA by having the West of England enter into a lawful agreement with Jet Line. That contract provided that Jet Line would release the ELRAKWA and thereafter refrain from attaching any other vessels or property of defendants at any time including refraining from attachments to obtain satisfaction of any judgment. In return for this promise by Jet Line, defendants' insurer promised to appear in the case on behalf of the owners of the ELRAKWA and to satisfy any judgment Jet Line would obtain.

"Very simply, the letter of undertaking constitutes a contract between Jet Line and the West of England, a contract which was entered into quite voluntarily by defendants' insurer and not in obedience to any order of the Court. The letter of undertaking was not necessary to defendants' defense of the claims against them nor was it in any way compelled. In short, there being only a private contract involved and it not having been obtained or supported by any order or imprimatur of the Court, there is nothing for this court to 'vacate'.

"The defendants' claim that the ELRAKWA is immune from physical seizure due to application of the FSIA is likewise mooted. ELRAKWA is not now under seizure. All that remains is a piece of paper containing an agreement between Jet Line and the West of England; and the only issue is whether defendants' insurer will keep its promises. That issue will be ripe for resolution after plaintiff has judgment on the merits of its claim. After all if Jet Line does not succeed on the merits of its claim, the West of England owes Jet Line nothing."

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss and Motion to Vacate and Release Security at 11–13.

Both the agency question and the status of the so-called "private contract" resulting from the Letter of Undertaking must be considered in light of the Immunities Act. Even if defendant were found to be the principal beneficiary of plaintiff's services, seizure of defendant's ship as a means of ensuring jurisdiction is specifically forbidden under the Immunities Act. The Immunities Act would allow an in personam action for a maritime lien only as long as the provisions for notice under Section 1605(b)(1) and (2) are followed. *See 40 D 6262 Realty Corp. v. United Arab Emirates Government*, 447 F.Supp. 710 (S.D.N.Y. 1978) for an example of a party's failure to comply with the service requirements under a different section of the Immunities Act. By improperly seizing the M/V ELRAKWA as a means of securing jurisdiction in order to collect for its services to the M/V MARSA EL HARIGA, plaintiff in effect forfeited its in personam action for all times. As to the private contract between Jet Line and West of England, defendant's insurer, plaintiff itself admits that liability, if any, depends on the final resolution of the claim against defendant. Without expressing any opinion as to the relationship between Brega Naft and GNMTC, this Court has no other alternative but to dismiss plaintiff's claim against defendant because of plaintiff's failure to comply with the notice requirements of the Immunities Act. It may well be that plaintiff has some claim against the charterer, Brega Naft, but it is certain that due to the improper seizure, any claim against GNMTC and the M/V MARSA EL HARIGA is now barred by lack of jurisdiction in light of the sovereign immunity to be accorded GNMTC.

The requirements of Section 1605 are precisely and clearly written so as to give effect to the restrictive theory of sovereign immunity. The exception provided for

maritime liens in that section is itself premised upon the "*commercial activity* of a foreign state." In the present case, plaintiff could easily have obtained in personam jurisdiction to maintain the suit by mailing a copy of the summons and complaint to a representative of GNMTC or the Libyan government pursuant to Section 1605(b)(1). While attachment of a vessel worth some $24,000,000 might have provided plaintiff with a sense of comfort in terms of realizing on its claim of $91,310.00, it was precisely this type of precipitous behavior which the Immunities Act was intended to discourage.

Accordingly, it is this 27th day of November, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That defendant's motion to dismiss be, and the same is, hereby GRANTED; and

2. That defendant's motion to vacate and release security be, and the same is, hereby GRANTED.