**Lawrence R. ALBERTI and Alberti International, Inc., Plaintiffs-Appellants,**

v.

**EMPRESA NICARAGUENSE DE LA CARNE and the Republic of Nicaragua, Defendants-Appellees.**

No. 82–2095.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1983.

Decided April 18, 1983.

Paul G. Simon, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs-appellants.

Paul S. Reichler, Powell, Goldstein, Frazer & Murphy, Washington, D.C., for defendants-appellees.

Before PELL and ESCHBACH, Circuit Judges, and NEAHER,* Senior District Judge.

PELL, Circuit Judge.

Plaintiffs-appellants appeal from the district court's dismissal of their two-count complaint. Although this case presents complex legal questions, the factual background of the dispute is relatively simply. Lawrence Alberti and Alberti International, Inc. owned 35 percent of the stock of Empacadora Nicaraguense, S.A., a Nicaraguan corporation engaged in the business of slaughtering livestock and packaging beef. During September of 1979, the Government of Nicaragua nationalized Empacadora and began operating the business through its agent, Empresa Nicaraguense De La Carne (ENCAR). Plaintiffs, who valued their Empacadora stock at $1,163,630.30 at the time of expropriation, have not received any compensation nor have they sought to obtain compensation through whatever channels are available in Nicaragua.

After the nationalization Alberti International ordered $739,306.45 worth of frozen beef from ENCAR. ENCAR delivered the beef to Alberti International in Florida, but Alberti International has not yet paid any of the amount owed. Instead, plaintiffs filed a two-count complaint in Illinois state court. Count I sought recovery for wrongful conversion of plaintiffs' Empacadora stock. Count II sought a declaratory judgment approving plaintiffs' right to offset the value of their converted stock against the value of the beef purchased. Plaintiffs alleged that defendants had transacted business and committed tortious acts within Illinois. The complaint and summons were served by mail upon the Ambassador of Nicaragua in Washington, D.C.

Shortly after plaintiffs filed suit, ENCAR filed suit in Florida state court requesting recovery of the amount owed by plaintiffs for the shipment of beef. This suit has been stayed pending the outcome of the litigation before us.

Defendants removed the Illinois suit to federal court and moved to dismiss on the basis of improper service of process, lack of subject matter jurisdiction, lack of personal jurisdiction and because judicial examination of the nationalization was precluded by the act of state doctrine. Defendants supported their motion with an affidavit of the Minister Counselor of the Embassy of Nicaragua stating that procedures were available for plaintiffs to seek compensation in Nicaragua. Plaintiffs did not respond to this motion. The district court granted the motion on all grounds presented by defendants without a written opinion.

### I. Statutory Framework

■ In 1976 Congress enacted the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611, which sets forth "the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." H.R. Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6610 (hereinafter referred to as House Report). FSIA starts from a premise of immunity from jurisdiction for foreign states and then provides several exceptions under which a foreign state may be subject to the jurisdiction of a court of the United States. 28 U.S.C. § 1604; House Report at 6616. These exceptions, discussed hereinafter, allow the court to obtain subject matter jurisdiction over the case and provide the minimum contacts with the United States required by due process before a court can acquire personal jurisdiction. House Report at 6612. Under FSIA, subject matter jurisdiction coupled with proper service of process establishes personal jurisdiction. 28

* Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation.

U.S.C. § 1330(b); House Report at 6612. The act of state doctrine, which does not affect the jurisdiction of the court, is not governed by FSIA but rather remains a creature of the judiciary.

■ FSIA defines a "foreign state" as including an agency or instrumentality of a foreign sovereign. There is no question but that ENCAR falls within this definition and accordingly our decision is directed by the act.

## II. Service of Process

■ Section 1608 of FSIA, which establishes a federal long-arm statute for suits against foreign states, delineates the "exclusive procedures" for effecting service of process upon a foreign state. Of the four methods provided by section 1608 only that set out in paragraph (3) is of any relevance. Paragraph (3) provides for service by:

> sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned.

Plaintiffs have argued that the Ambassador of Nicaragua can be "construed" as the head of the ministry of foreign affairs. The legislative history of FSIA, however, makes clear that this is not a permissible construction of section 1608(a)(3). In discussing methods of service used prior to the act the House Report states that:

> A second means [of service], of questionable validity, involves the mailing of a copy of the summons and complaint to a diplomatic mission of the foreign state. Section 1608 precludes this method so as to avoid questions of inconsistency with section 1 of Article 22 of the Vienna Convention on Diplomatic Relations.... *Service on an embassy by mail would be precluded under this bill.*

House Report at 6625 (emphasis added). What case law there is supports this position. *Hellenic Lines, Ltd. v. Moore,* 345 F.2d 978 (D.C.Cir.1965); *Purdy v. Argentina,* 333 F.2d 95, 97 (7th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965).

Plaintiffs' service was simply inadequate under section 1608(a)(3). In apparent recognition of this plaintiffs have argued that the proper remedy is to provide them with a second chance at effecting proper service rather than dismissing their suit. If this argument has any merit it is only in a situation in which proper service can be made and jurisdiction obtained over the defendant. It would be a waste of judicial resources to allow plaintiffs to go through the motions of service if the suit will be later dismissed on some other ground. Resolution of plaintiffs' request, then, must abide our review of defendants' remaining grounds for dismissal.

## III. Subject Matter Jurisdiction

■ Whether the district court was correct in holding that it lacked subject matter jurisdiction over this particular suit depends upon whether defendants are immune from suit regarding the nationalization under FSIA. It is uncontested that defendants bear the burden of establishing their immunity from this suit; therefore, the only issue is whether they have met this burden.

As previously noted, FSIA provides foreign states with immunity from suits regarding their public acts. FSIA then provides a number of exceptions to this immunity. The exceptions plaintiffs claim are relevant are those contained in sections 1605(a)(2), (3) and 1607(c). Section 1605 provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
>     ....
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;

or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

Section 1607 provides that:

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

. . . .

(c) to the extent that the counterclaim does not seek relief exceeding in amount or different in kind from that sought by the foreign state.

■ We need spend little time discussing the claim that section 1605(a)(2) is applicable to this case. Plaintiffs argue that because they seek to offset their debt to EN-CAR with their loss from the nationalization the "controversy is clearly an action based upon the commercial activity of defendants carried on within the United States and jurisdictional immunity cannot attach under § 1605(a)(2)." We disagree. There is no "controversy" about plaintiffs' obligation to pay for the beef. The commercial transaction involved, the beef shipment, has nothing to do with this lawsuit beyond the fact that it gave rise to the debt plaintiffs seek to offset. The basis of this lawsuit is the nationalization of Empacadora, which is a quintessential Government act. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Empresa Cubana Exportadora, Inc.*

*v. Lamborn & Co.,* 652 F.2d 231 (2d Cir. 1981); *Carey v. National Oil Corp.,* 453 F.Supp. 1097, 1102 (S.D.N.Y.1978), *aff'd,* 592 F.2d 673 (2d Cir.1979). Plaintiffs cannot transform this governmental dispute into a commercial dispute through the simple expedient of attempting to offset an unrelated commercial debt.

■ Equally unavailing is plaintiffs' claim that section 1607(c) removes immunity in this case. Plaintiffs recognize that 1607(c), on its face, requires that the lawsuit be brought by the foreign state and that the counterclaim be raised by the defendants to that suit. Despite this seemingly insurmountable obstacle plaintiffs claim that requiring them to wait until actually sued by defendants before pressing their counterclaim "is an obvious attempt to place form over substance." Plaintiffs fail to realize that in this situation the "form" is the substance. The rationale behind the counterclaim exception is the desire to remove the basic unfairness of the situation in which "[w]e have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice." *National City Bank of New York v. Republic of China,* 348 U.S. 356, 361–62, 75 S.Ct. 423, 427–428, 99 L.Ed. 389 (1955); *see also* House Report at 6622 (§ 1607(c) intended to codify the rule in *National City Bank* ).

In this case, however, the Government of Nicaragua had not invoked our law but rather to the extent it is in our courts in this suit it has been forced here by plaintiffs. Until Nicaragua seeks to use the courts of this country the rationale for allowing counterclaims does not come into play. Plaintiffs may not expedite this event by seeking a declaratory judgment of their right to offset should ENCAR sue on the debt. That ENCAR subsequently filed suit in Florida does not retroactively validate plaintiffs' ploy. Plaintiffs are, of course, free to press their counterclaim in Florida and the result we reach in this case does not preclude their doing so.

Plaintiffs' final basis for removing this case from the protection of sovereign immunity rests upon their allegation that the nationalization was in violation of international law. If this is the case then defendants' immunity is removed by section 1605(a)(3), as the remaining elements are present. To decide this issue we must determine what is required by international law to validate a nationalization and then allocate the appropriate burdens of proof.

Plaintiffs raise in their reply brief, apparently for the first time, the contention that international law requires actual payment of adequate compensation to the owners of nationalized property. As it is uncontested that plaintiffs have not yet received any compensation, under this theory the expropriation of plaintiffs' property was in violation of international law. Defendants argue that international law only requires that the taking nation establish reasonable provisions for the determination and payments of just compensation. Whether Nicaragua has established the requisite provisions is disputed by the parties.

Resolution of questions of international law concerning nationalization is a difficult task. Even the most cursory examination of the subject reveals fundamental differences of opinion between the various nations and commentators on the amount of payment due, the form the payment must take, and when payment must be made. The generally accepted formulation is that the expropriating nation must provide "prompt, adequate and effective" compensation, but there is little agreement on the meaning of these terms. *See Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 888 (2d Cir.1981); "Prompt, Adequate and Effective": A Universal Standard of Compensation? Dawson & Weston, 30 Fordham L.Rev. 727 (1962). Plaintiffs' position, by necessity, goes beyond the requirement of "prompt" payment and instead demands prior payment. Although there is some support for this view, it appears that "[h]istoric practice ... seriously challenges theories of immediate or prior payment, emphasizing instead the deferred character of compensation.... In

practice, the term 'prompt' seems not to have been defined by rigid formulae. Its meaning would appear influenced by the peculiarities of each case." *Id.* at 736; *see also* Expropriation in International Law— Strategies of Avoidance and Redress, Pederson, 10 U.Tol.L.Rev. 73, 93–98 (1978). We think that international law does not require payment of compensation prior to nationalization. Our position is buttressed by Congress' adoption of the "prompt," rather than a prior or immediate, payment standard in the legislative history of 1605(a)(3). House Report at 6618. Prompt payment, by definition, is made within a reasonable time *after* nationalization. As long as the expropriating nation affords property owners a means of obtaining prompt payment the dictates of international law have been satisfied.

Defendants bear the ultimate burden of proving that they are entitled to immunity. House Report at 6616; *Jet Line Services, Inc. v. M/V Marsa El Hariga,* 462 F.Supp. 1165, 1171 (D.Md.1978). Both parties have focused their arguments on whether defendants have proved the existence of reasonable provisions for compensation in Nicaragua. Under our view of FSIA we need not reach this question. As we have noted, section 1604 of FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." To avail itself of this immunity the foreign state must produce evidence:

> to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that plaintiff's claim relates to a public act of the foreign state—that is, an act not within the exceptions in section 1605–1607. Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state.

House Report at 6616; *see also Jet Line Services, Inc. v. M/V Marsa El Hariga,* 462 F.Supp. at 1171.

■ In our opinion section 1604 requires a foreign state to establish a prima facie case on two elements: that it is a foreign state under the definition employed in FSIA, and that the claim relates to a "public act." Once this evidence is produced section 1604 provides a "presumption" of immunity that a plaintiff must rebut by offering evidence that one of the statutory exceptions applies. It is only when the plaintiff has produced this evidence that the defendant must prove its entitlement to immunity by a preponderance of the evidence. Plaintiffs do not contend that defendants have failed to establish that they are both to be treated as foreign states under FSIA. The question that remains is whether defendants have established that the suit relates to a public act. The only definition of public act appears in the suggestion in the legislative history that a public act is "an act not within the exceptions in sections 1605–1607." House Report at 6616. This definition, which is circular, would require a defendant to establish the inapplicability of every statutory exception. Common sense refutes this position as it would be a near impossible task for a defendant to refute the exceptions before the plaintiff has indicated which one is applicable or, as in this case, how a nationalization was in violation of international law. Furthermore, it would be a waste of time to require the defendant to produce this evidence when the plaintiff could easily indicate which exception is applicable and produce minimal support as to its applicability. Accordingly, we believe that the purposes of the act will best be served by requiring that the defendant demonstrate that the suit relates to a governmental act of the foreign state being sued, and then placing the burden of identifying the relevant exception by affidavit or otherwise upon the plaintiff.

This reading of section 1604 is supported by the legislative history of FSIA. Prior to the enactment of FSIA the courts of this country employed the "restrictive" theory of sovereign immunity. Under this approach immunity was "restricted" to suits involving public, governmental acts, while no immunity was provided for claims involving the commercial or private acts of a foreign state. Note: Sovereign Immunity of States Engaged in Commercial Activity, 65 Colum.L.Rev. 1086 (1965). One of the primary goals of Congress in enacting FSIA was to codify the restrictive theory of immunity. As noted in the House Report, the act:

> would codify the so-called "restrictive" principle of sovereign immunity, as previously recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign's state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).

House Report at 6605; *see also Behring International, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383, 388 (D.N.J.1979).

■ In this case there can be no question but that defendants have established that they fit within the statutory definition of a foreign state and that the suit relates to a public, governmental act; the nationalization of property. Defendants having established a prima facie entitlement to immunity it was plaintiffs' obligation to produce support for their position that a statutory exception was applicable. This they did not do; although they were not precluded from adducing affidavits. Instead they failed even to respond to defendants' motion to dismiss. In this situation, defendants need not disprove a claim that the nationalization was in violation of international law, and we need not consider whether their affidavit was sufficient for this purpose.

As plaintiffs will be unable to obtain jurisdiction over defendants even if they serve process properly there is no reason not to dismiss this particular suit. Because the district court was without jurisdiction over this case its decision on the claim that the act of state doctrine precluded plain-

tiffs' recovery was void and is vacated and we need not address the issue ourselves. For the reasons herein and in accordance with this opinion the judgment of dismissal is AFFIRMED.