Douglas **MANN** and Michael Dubis, Co-Receivers, and Paliafito America, Inc., an Illinois corporation, Plaintiffs,

v.

**HANIL BANK, Korea Exchange Bank, Cho Hung Bank Commercial Bank of Korea, Ltd., Industrial Bank of Korea, Min Suk Han, J.R. Kang, M.Y. Park, Seung Suk Han, Sin Won Kang, Yoon Soo Han, Tae–Young Suh, Jang–Seok Han and Se–Myeong Yoo, Defendants.**

No. 94–C–1165.

United States District Court, E.D. Wisconsin.

Aug. 31, 1995.

See also: 828 F.Supp. 1301.

Peter C. Blain, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, David E. Springer, John K. Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, Harold A. Laufer, Davis & Kuelthau, Milwaukee, WI, for plaintiffs.

Charles R. McKirdy, Rudnick & Wolfe, Chicago, IL, Clay R. Williams, Thomas R. Streifender, Ken A. Hoogstra, Gibbs, Roper, Loots & Williams, Milwaukee, WI, for defendants.

### DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court are (1) defendants Korea Exchange Bank ("KEB") and Industrial Bank of Korea's ("Industrial Bank") Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), and (2) defendants Hanil Bank, KEB, Cho Hung Bank, Commercial Bank of Korea, Ltd., and Industrial Bank's (collectively referred to hereinafter as "the Korean banks") Motion to Dismiss Counts II and III of the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (3), and (6) in the above-captioned matter. For the following reasons, the first motion is granted as to Counts II and III of the Complaint but denied as to Count I, and the second motion is granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action originated from a multi-million dollar dispute over an agreement to distribute the widely-popular Grip Ball game in the United States. Select Creations, Inc. procured orders and acted as the "mass-marketing consultant" for the game; Paliafito America, Inc. ("Paliafito") acted as its exclusive United States distributor; and Miryoung ("Joy") Lee and Jong Sik ("Jerrold" or "Jerry") Lee owned several foreign and domestic corporations ("collectively referred hereinafter to as "the Mantae defendants") which manufactured and sold the game. The facts underlying the parties' dispute are complex, and were previously recited by this Court in exhausting detail. *See Select Creations, Inc. v. Paliafito America, Inc. ("Paliafito I ")*, 828 F.Supp. 1301, 1305-54 (E.D.Wis.1992). On December 1, 1992, the Court, *inter alia,* issued a writ of attachment against the Mantae defendants, ordered them "to make available for attachment a sufficient amount of funds to effectuate the writ of attachment" (the amount to be set after further briefing), appointed a receiver "to protect the attached assets of" the Mantae defendants, issued a writ of attachment against Paliafito in the amount of $1,678,829.67, and ordered Paliafito not to use said funds to pay legal fees; we did not, however, "issue an order preventing [the Mantae defendants] from removing assets from the United States once a sufficient amount of their assets [had] been attached." *Id.* at 1366-68. Paliafito made two subsequent motions for a writ of attachment, preliminary injunction, and appointment of a receiver. *Select Creations, Inc. v. Paliafito America, Inc. ("Paliafito II ")*, 830 F.Supp. 1213, 1215 (E.D.Wis.1993). The first was granted on February 19, 1993, and required the Mantae defendants to deposit $8 million with the Receiver; the second, titled "the First Supplemental Writ of Attachment," was granted on April 7, 1993, and further enjoined the Mantae defendants from transferring assets or taking other steps to hide or dissipate assets. *Select Creations v. Paliafito America, Inc. ("Paliafito IV")*, 852 F.Supp. 740, 747 (E.D.Wis.1994).

The Court, however, has not of yet been afforded the opportunity to address the merits of the parties' dispute. As previously recited:

"On April 7, 1993, this Court entered the First Supplemental Writ, which required, *inter alia,* that the Mantae defendants deposit $8 million in cash and marketable securities with Firstar Trust Co. ('the Receiver') by April 15, 1993. (First Supplemental Writ at ¶ 6.) The Mantae defendants were also required to post a bond of $50,000 plus an affidavit of surety. (*Id.* at ¶ 7.) In turn, Paliafito was required to deposit $1.43 million in cash or marketable securities with the Receiver. (*Id.* at ¶ 4; Stannard Dec. at ¶ 2.) The First Supplemental Writ stated, however, that if either party failed timely to deposit the required funds, the Court would, upon motion by the nonviolating party, 'enter judgment against the violating party in the amount of the attachment assessed against the violating party and dismiss with prejudice the claims of the violating party.' (First Supplemental Writ at ¶ 17.)

The Mantae defendants failed to make the required deposit. (Stannard Dec. at ¶¶ 4-5.)"

*Select Creations, Inc. v. Paliafito America, Inc. ("Paliafito III ")*, 830 F.Supp. 1223, 1229 (E.D.Wis.1993). On August 19, 1993, after finding that the Lees "willfully failed to comply with a direct court order" and that all of the Mantae defendants other than Mantae Company Limited ("MCL") had failed to contest Paliafito's motion for a default judgment, the Court issued an $8 million default judgment against them as provided under the First Supplemental Writ. *Id.* at 1231-41.

On December 29, 1992, the Lees established a new Korean company, MJ Korea, Ltd., to which they transferred their Korean Grip Toys business in an attempt to avoid the attachment of assets pursuant to the Court's December 1, 1992 Order. *Paliafito IV*, 852 F.Supp. at 746-47, 766 (E.D.Wis.1994). On April 21, 1993, after the Court had issued the First Supplemental Writ of Attachment, Min Suk Han, a defendant in the above-captioned matter and a citizen and resident of Seoul, Korea, purchased, along with several of his relatives, eighty-five percent of the shares of

MJ Korea, paying approximately $50,000 and pledging approximately $8 million in real estate titled to Han family members to a consortium of five Korean banks to obtain short-term financing.[1] *Id.* at 747–49. On June 17, 1993, Min Suk Han and the Lees entered into a partnership agreement, with Jerry Lee "responsible for production guidance and supervision of [MJ Korea]" and Joy Lee "responsible for selling [Grip Toys] produced by [MJ Korea];. the Lees also "assigned MAI, Ltd.'s and Mi Jong's $12 million claim on MAI's inventory [all Mantae defendants] to Min Suk Han and promised to turn over to MJ Korea more than six billion Won in raw materials owned by MAI, Ltd." *Id.* at 751–52. In October of 1993, after discovering that the Lees had made fraudulent representations and that Jerry Lee had embezzled money from MJ Korea, Min Suk Han terminated their partnership and initiated criminal proceedings in Korea against Jerry Lee. *Id.* at 755–56.

MAI, one of the Mantae defendants, had filed a Chapter 11 bankruptcy petition on February 22, 1993. *Id.* at 747. The bankruptcy court authorized MAI's interim Chapter 7 trustee, Duke Salisbury, to auction off its assets on February 4, 1994; Salisbury knew that Paliafito felt that any transfer of assets to MJ Korea through the sale of property at auction would violate the terms of the First Supplemental Writ. *Id.* at 757. In January of 1994, however, Yang Ok Han, Min Suk Han's daughter, and Andy Oh, the general manager of the United States branch of MJ Korea ("MJ USA"), incorporated Longreen Toys, Inc. ("Longreen") "as a measure to be taken in the chance that Paliafito would not consent to MJ Korea bidding at the auction." *Id.* Yong Su Paek, a Korean businessman connected with Min Suk Han and MJ Korea, executed the certificate of incorporation and became Longreen's sole shareholder, president and chief financial officer. *Id.* at 745, 758. In addition, "[t]he money used to capitalize Longreen came from MJ Korea" by way of a $2.5 million loan from MJ Korea to Paek secured by his Longreen stock as well as its assets. *Id.* at 758. Paek reported to Oh, and "all of the income earned by Longreen [went] to MJ Korea." *Id.* at 759. At the auction, Longreen submitted the highest bid for MAI's assets; nobody from MJ Korea told Salisbury that they "were related to or affiliated with the Longreen group." *Id.* at 760.

On February 10, 1994, Paliafito filed an Emergency Motion for Entry of a Second Supplemental Writ of Attachment ("Second Supplemental Writ"), requesting that the Court appoint a receiver to take custody of assets purchased at the MAI auction and enjoin the Han respondents from selling Grip Toys products. *Id.* at 762. On February 25, 1994, the Court entered a preliminary order which, *inter alia*, restricted the purposes for which MJ Korea, Longreen, and MHW Inc. (collectively referred to hereinafter as "the Mantae transferees") could transfer funds out of the United States. On April 27, 1994, after conducting a week-long evidentiary hearing, the Court granted Paliafito's motion, and entered judgment against, *inter alia*, MJ Korea and Longreen Toys, jointly and severally, in the amount of $8 million; Min Suk Han was not included for jurisdictional reasons. *Id.* at 763–82.

On May 31, 1994, the Court entered a Writ of Execution to enforce judgment in said case which, in pertinent part, imposed a general freeze on all assets legally or beneficially owned by the Mantae defendants and the Mantae transferees, and appointed Douglas Mann and Michael Dubis as co-receivers. Paragraph 20 of the Writ provides as follows:

"The Mantae defendants,. the Mantae transferees, Yang Ok Han, and any of their officers, directors, attorneys, employees, agents, parent corporations, subsid-

---

1. Specifically, the Court made the following factual findings in *Paliafito IV:*

 "49. On April 21, 1993, the Hans purchased eighty-five percent of the shares of MJ Korea. A fifteen percent interest was retained by Jong Ok Choi, a member of the original shareholder group.

 50. The Hans paid approximately 42,500,-000 Won (approximately $50,000) for the stock. *Min Suk Han also pledged real estate titled in the names of family members to the Korean Exchange Bank to obtain short-term financing for MJ Korea."*
 *Paliafito IV,* 852 F.Supp. at 748–49 (emphasis added).

iary corporations, shareholders, or affiliates, *and any person or entity in active concert or participation with them who receives actual notice of this Writ by personal service or otherwise,* are hereby permanently enjoined:

(a) *from* selling or otherwise *transferring any asset owned, legally or beneficially, by* the Mantae defendants or *the Mantae transferees,* including, without limitation, Gripball Games, Grip Football games, Scatch, Hit N Grip Games, any other Grip toy product or accessory, inventories, accounts receivable, bank accounts, marketable securities, currency, certificates of deposit, checks and other negotiable instruments and *for any purpose,* including the payment of attorneys' fees;

\* \* \* \* \* \*

(g) *from failing to turn over to the Co–Receivers all assets owned, legally or beneficially, by* the Mantae defendants or *the Mantae transferees* wherever located . . ."

(emphasis added). In its Complaint, Paliafito and the Co–Receivers claim that (1) "Longreen transferred $1,210,913.92 to the defendant Korean Banks, the bulk of which transfers were in direct violation of this Court's order dated February 25, 1994" and the Uniform Fraudulent Transfer Act; (2) because the $8 million in Korean real estate and other property pledged by Min Suk Han and defendants J.R. Kang, M.Y. Park, Seung Suk Han, Sin Won Kang, Yoon Soo Han, Tae–Young Suh, Jang–Seok Han, and Se–Myeong Yoo (collectively referred to as "the Han defendants") to the Korean banks to secure financing for MJ Korea "was part of the equity investment of the owners of MJ Korea [ ] and constitutes an asset of MJ Korea properly subject to execution," the Court should order the Korean banks to "liquidate the collateral and [ ] deposit the proceeds in the Eastern District of Wisconsin for garnishment"; and (3) if the Court does not find the $8 million in Korean real estate to be subject to execution, the Court should require "equitable marshaling of the assets" by ordering the Korean banks "to satisfy the total amount of the judgment debtors' obligations to them out of the collateral, and to

turn over all remaining assets [ ] to the plaintiffs."

On February 10, 1995, the plaintiffs moved for a preliminary injunction to prevent the Korean banks from "releasing or otherwise transferring the remaining [ ] collateral." In a telephone conference held late that afternoon, the Court issued a temporary restraining order prohibiting the Korean banks from releasing or otherwise transferring rights that they have under mortgages securing the real estate that was pledged by the Han defendants to secure the indebtedness of, *inter alia,* MJ Korea, to be effectuated upon the plaintiffs posting a $1,000,000 bond. On February 16, 1995, after conducting a one-day hearing, the Court denied the plaintiffs' preliminary injunction request.

## II. *STANDARD OF REVIEW*

 "Rule 12(b)(1) requires that an action be dismissed if the court lacks jurisdiction over the subject matter of the lawsuit." *Unity Sav. Ass'n v. Federal Sav. & Loan Ins. Corp.,* 573 F.Supp. 137, 140 n. 4 (N.D.Ill. 1983). When ruling on such a motion, the Court "is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the . . . court to proceed with the action." *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979); *Chicago Dist. Council of Carpenters Pension Fund v. Kustom Line Garage Door Co.,* 1989 WL 152531 (N.D.Ill. Dec. 11, 1989). Instead, the Court should "look beyond the jurisdictional allegations in the complaint and view whatever evidence has been submitted on the issue in determining whether in fact subject matter jurisdiction exists." *Grafon,* 602 F.2d at 783; *Chicago Dist.,* 1989 WL 152531, at \*1. Where subject matter jurisdiction is at issue, "the party invoking jurisdiction has the burden of supporting the allegations of jurisdictional facts by competent proof." *Grafon,* 602 F.2d at 783; *Geiger v. United States,* 1989 WL 31100 (N.D.Ill. March 28, 1989). *See also Western Transp. Co. v. Couzens Warehouse & Dist., Inc.,* 695 F.2d 1033, 1038 (7th Cir.1982); *Nuclear Eng'g Co. v. Scott,* 660 F.2d 241, 252 (7th Cir.1981). Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion cannot "evolve into a dismissal [for summary

judgment] pursuant to Rule 56." *Capitol Leasing Co. v. Federal Deposit Ins. Corp.,* 999 F.2d 188, 191 (7th Cir.1993); *Crawford v. United States,* 796 F.2d 924, 928 (7th Cir. 1986).

■■■ Rule 12(b)(6) authorizes the Court to dismiss a case "for failure to state a claim upon which relief can be granted." In deciding such a motion, the Court must accept as true all well-pleaded factual allegations contained in the plaintiff's complaint, viewing all reasonable inferences in the light most favorable to the plaintiff. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Gillman v. Burlington N. R.R. Co.,* 878 F.2d 1020, 1022 (7th Cir.1989); *Republic Steel Corp. v. Pennsylvania Eng'g Corp.,* 785 F.2d 174, 177 n. 2 (7th Cir.1986). The plaintiff, however, must set forth factual allegations in the complaint adequate to establish the essential elements of his or her claim, *see Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985); *Sutliff, Inc. v. Donovan Co., Inc.,* 727 F.2d 648, 654 (7th Cir.1984), and legal conclusions lacking adequate support should not be considered. *Benson,* 761 F.2d at 338. The Court must deny such a motion unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle him or her to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Benson,* 761 F.2d at 338. The court's inquiry is generally limited to the factual allegations contained within the four corners of the complaint, *see, e.g., Hill v. Trustees of Indiana Univ.,* 537 F.2d 248, 251 (7th Cir.1976); however, "[i]f ... matters outside the pleading are presented to and not excluded by the court," a Rule 12(b)(6) motion must be treated as a Rule 56 Motion for Summary Judgment. *See Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993); *R.J.R. Services, Inc. v. Aetna Casualty and Sur. Co.,* 895 F.2d 279, 281 (7th Cir.1989); *Winslow v. Walters,* 815 F.2d 1114, 1116 (7th Cir.1987).

## III. *DISCUSSION*

### A. PARTIES' ARGUMENTS:

### 1. *Motion by KEB and Industrial Bank to Dismiss the Complaint:*

Industrial Bank and KEB argue that, because they are both majority-owned by ad-ministrative agencies of the Republic of Korea, they both qualify as "agencies or instrumentalities of a foreign state" under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1604, and are therefore immune from federal and state court jurisdiction. The plaintiffs respond that the Industrial Bank and KEB do not qualify for immunity under the FSIA because (1) the plaintiffs' claims do not "relate to a 'public' or 'governmental' act of the foreign state," and (2) the "commercial activities" exception to the FSIA rule of immunity, which excludes immunity if "the action is based ... upon a commercial activity carried on in the United States by the foreign state; or ... upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States," is applicable in this case.

### 2. *Motion by the Korean banks to Dismiss Counts II and III:*

The Korean banks argue that the "local action doctrine" mandates dismissal of Counts II and III of the Complaint. They indicate that, pursuant to that doctrine, "federal and state courts lack jurisdiction over the subject matter of claims to land located outside the state in which the court sits." *Hayes v. Gulf Oil Corp.,* 821 F.2d 285, 287 (5th Cir.1987). According to the Korean banks, because "[t]he plaintiffs want this court to determine the title to real property in the Republic of Korea, affect that country's title records, and then require officials there to conduct a foreclosure sale to liquidate the collateral," this Court lacks subject matter jurisdiction and/or venue to hear this claim. They further argue that Count II should be dismissed because the plaintiffs have failed to sufficiently allege irreparable injury, which they claim is a prerequisite for mandatory injunctive relief. Specifically, they claim that "[t]he plaintiffs have not alleged that the judgment debtors have no other assets which can be exploited to satisfy

the judgment[,] have not alleged that they have exhausted all other means of collecting on their judgment[, and] have not even alleged that they have utilized all other means to reach the collateral in question." Finally, they claim that equitable marshaling is not an option in this case because the Korean banks do not have the right to foreclose on the collateralized property absent a default by the Han defendants and because the doctrine "is not enforced when the effect of applying the doctrine would be to compel the paramount creditor to proceed by an independent action, such as for the foreclosure of a mortgage."

The plaintiffs respond that, because the property pledged by the Han defendants to the Korean banks "constitutes a contribution of capital [to MJ Korea] as a matter of law," MJ Korea has a "beneficial interest in the collateral [ ] subject to execution." They claim that execution is not barred by the local action doctrine because it "only operates *in personam* against the [Korean] banks," and only indirectly affects real property. The plaintiffs further argue that they have established irreparable harm, although they need not do so to qualify for post-judgment injunctive relief, and that "under the regimen postulated by defendants, no court could order a nonparty to turn over debtor's property subject to execution unless the creditor alleged that it had exhausted all other avenues of recovery." Finally, the plaintiffs claim that equitable marshaling is appropriate in this case because (1) the collateral pledged by the Han defendants "constituted a contribution to the capital of MJ Korea," (2) "the effect of the requested order will nullify any payments [made by the Han defendants] to the [Korean] banks," thereby ripening their right to foreclose; and (3) "the

requested relief will preserve the rights of those entitled to protection."

**B. ANALYSIS:**

**1. Motion by KEB and Industrial Bank to Dismiss the Complaint:**

**a. Burden-shifting under the FSIA and the defendant's prima facie case:**

■ The FSIA "provides foreign governments and certain of their instrumentalities with limited immunity from suit in the United States." *Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 891 (7th Cir.1991).[2] The language used in the FSIA to effectuate this is straightforward: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act [enacted Oct. 21, 1976] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States *except as provided in sections 1605 to 1607 of this chapter.*" 28 U.S.C. § 1604 (emphasis added). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, ——, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993) (*quoting Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 692, 102 L.Ed.2d 818 (1989) *and citing Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488–89, 103 S.Ct. 1962, 1968–69, 76 L.Ed.2d 81 (1983)).

Citing *Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 256 (7th Cir. 1983), the plaintiffs claim that the Korean banks must "produce admissible evidence to establish a *prima facie* case [of FSIA immunity] on two elements: that it is a foreign

**2.** An "agency or instrumentality of a foreign state" entitled to immunity under the FSIA is defined as "any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title nor created under the laws of any

third country." 28 U.S.C. § 1603(b). The plaintiffs do not dispute that KEB, a Korean corporation and non-U.S. citizen with 65.289 percent of its issued and outstanding stock owned by the Bank of Korea, and Industrial Bank, a Korean corporation and non-U.S. citizen with 66.54 percent of its issued and outstanding stock held by the Ministry of Finance of the Republic of Korea, qualify as "agencies or instrumentalities" of the Republic of Korea.

state under the definition employed in the FSIA, and that the claim the plaintiff asserts relates to a 'public' or 'governmental' act of the foreign state"; according to the plaintiffs, the Korean banks have failed to prove the second element. The Court, however, agrees with the defendants that this no longer stands as an accurate recitation of the burden-shifting standards applied under the FSIA. As an initial matter, it is contrary to the plain language of the statute. Section 1604 of the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country," *Nelson,* 507 U.S. at ——, 113 S.Ct. at 1476, imposes no requirement that a foreign state first show that the plaintiff's claim relates to a "public or governmental act" in order to qualify for immunity from suit; instead, it simply grants immunity to "a foreign state ... except as provided in sections 1605 to 1607 of this chapter." None of these sections, in turn, expressly exempt from immunity foreign states generally engaging in "non-public or non-governmental" acts. Congress could certainly have created such an exception had it seen fit; as impliedly acknowledged in *Nelson,* its failure to do so exhibits its clear intention that immunity be presumed, even if the plaintiff's claim is based on what might be deemed a "public or governmental act," so long as none of the enumerated FSIA exceptions apply. As a result, KEB and Industrial Bank need not meet this heightened standard in order to qualify for immunity in this case.

This conclusion is supported by a fair reading of the chronology and legislative history underlying the FSIA. The Seventh Circuit based its *Alberti* holding regarding the elements comprising a *prima facie* case of immunity on what it deemed "the legislative history of FSIA." Specifically:

> "Prior to the enactment of the FSIA the courts of this country employed the 'restrictive' theory of sovereign immunity. Under this approach immunity was 're-stricted' to suits involving public, governmental acts, while no immunity was provided for claims involving the commercial or private acts of a foreign state. One of the primary goals of Congress in enacting FSIA was to codify the restrictive theory

of immunity. As noted in the House Report, the act:

> > would codify the so-called 'restrictive' principle of sovereign immunity, as previously recognized in international law. Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)."

*Alberti,* 705 F.2d at 256 (citation omitted). To determine precisely *how* Congress intended the FSIA to incorporate this principle, however, the Supreme Court had delved further into the historical development of the doctrine of sovereign immunity:

> "For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country. In *The Schooner Exchange v. M'Faddon,* [11 U.S. (] 7 Cranch[) ] 116[, 3 L.Ed. 287] (1812), Chief Justice Marshall concluded that, while the jurisdiction of a nation within its own territory 'is susceptible of no limitation not imposed by itself,' *id.* at 136, the United States had impliedly waived jurisdiction over certain activities of foreign sovereigns ...

> As *The Schooner Exchange* made clear, however, foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution. Accordingly, this Court consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities ...

> Until 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns. But in the so-called Tate Letter, the State Department announced its adoption of the 'restrictive' theory of foreign sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to

cases arising out of a foreign state's strictly commercial acts.

The restrictive theory was not initially enacted into law, however, and its application proved troublesome. As in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department, and the courts abided by 'suggestions of immunity' from the State Department. As a consequence, foreign nations often placed diplomatic pressure on the State Department in seeking immunity. On occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory.

An additional complication was posed by the fact that foreign nations did not always make requests to the State Department. In such cases, the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions. Thus, sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied.

In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process,' H.R.Rep. No. 94–1487, p. 7 (1976). To accomplish these objectives, the Act contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.

*For the most part, the Act codifies, as a matter of federal law, the restrictive theory of sovereign immunity. A foreign state is normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607. Those exceptions include actions in which the foreign state*

*has explicitly or impliedly waived its immunity, § 1605(a)(1), and action based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States, § 1605(a)(2) ...*

*... If one of the specified exceptions to sovereign immunity applies, a federal district court may exercise subject-matter jurisdiction under [28 U.S.C.] § 1330(a); but if the claim does not fall within one of the exceptions, federal courts lack subject-matter jurisdiction."*

*Verlinden,* 461 U.S. at 486–89, 103 S.Ct. at 1967–69 (citations and footnotes omitted) (emphasis added). Expanding on its *Verlinden* holding, the high court later observed:

*"We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts ... As we said in Verlinden, the FSIA 'must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity.' "*

*Argentine Republic,* 488 U.S. at 434–35, 109 S.Ct. at 688 (emphasis added).

The FSIA, then, codified the "restrictive theory" of sovereign immunity by expressly delineating the circumstances in which a foreign state would so qualify; it did not, however, *a fortiori* incorporate the procedural mechanisms used by courts in applying this theory prior to its date of enactment. By providing a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state," *Verlinden* at 488, 103 S.Ct. at 1968, Congress clearly intended for the FSIA to supplant common-law approaches to determining whether or not federal (and state) courts could exercise subject-matter jurisdiction over a foreign state. In essence, while endorsing the common-law notion that foreign states should only qualify for immunity based on acts which can be fairly characterized as "public" in nature, Congress took it upon itself in the FSIA to define, by way of exceptions to the presumption of immunity to foreign states,

those acts which would be considered to be "private" and, therefore, unprotected; all other acts would be presumed to be "public" and beyond the reach of the courts.

The legislative history cited by the *Alberti* court supports this view:

> "[The burden will remain on the foreign state to produce evidence in support of its claim of immunity. Thus, evidence must be produced] to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit *and that the plaintiff's claim relates to a public act of the foreign state—that is, an act not within the exceptions in sections 1605–1607.* Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state."

*Alberti*, 705 F.2d at 255 (*quoting* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 1, 17, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6616). A "public act," then, is presumed by Congress to be any act by a foreign state not encompassed by a specific FSIA exception. And despite the language used in this legislative history, Congress could not have intended for foreign states to disprove every FSIA exception, thereby establishing that the plaintiff's claim relates to a "public act," as part of their *prima facie* case. As noted in *Alberti:*

> "The only definition of public act appears in the suggestion in the legislative history that a public act is 'an act not within the exceptions in sections 1605–1607.' House Report at 6616. *This definition, which is circular, would require a defendant to establish the inapplicability of every statutory exception [in order to prove its prima facie case]. Common sense refutes this position as it would be a near impossible task for a defendant to refute the exceptions before the plaintiff has indicated which one is applicable* ... Furthermore,

it would be a waste of time to require the defendant to produce this evidence when the plaintiff could easily indicate which exception is applicable and produce minimal support as to its applicability."

*Alberti*, 705 F.2d at 256 (emphasis added). Inexplicably, the *Alberti* court nevertheless concluded that "the purposes of the act will best be served by requiring that the defendant demonstrate that the suit relates to a governmental act of the foreign state being sued" in order to establish its *prima facie* case. *Id.* This conclusion, of course, not only adopted the circular logic which the court purportedly sought to avoid, but also violated the clear language of § 1604, the policy reasons for which it was adopted, and the notion of presumptive immunity as articulated by the Supreme Court in *Verlinden* and *Nelson*.

■ These are no doubt the reasons why the conclusion reached by the *Alberti* court regarding the elements comprising the foreign state's *prima facie* case has not, to our knowledge, been endorsed by any other court, including those in the Seventh Circuit; since *Alberti* was decided, it has become well-established that, once a defendant earns a "presumption" of immunity under § 1604 by showing that it is a foreign state, it is the plaintiff's burden to rebut the foreign state's *prima facie* case of immunity by offering evidence that one of the statutory exceptions applies. *See, e.g., Drexel Burnham Lambert Group Inc. v. Committee of Receivers for A.W. Galadari*, 12 F.3d 317, 325 (2nd Cir. 1993) (*quoting Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2nd Cir. 1993)); *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 n. 6 (5th Cir.1993); *Gerding v. Republic of France*, 943 F.2d 521, 526 (4th Cir.1991). It is only after the plaintiff meets its burden of production that the foreign state must ultimately meet its burden of persuasion by proving by a preponderance of the evidence that it is entitled to immunity. *Drexel Burnham*, 12 F.3d at 325; *Alberti*, 705 F.2d at 256.[3] Thus, because the plain-

---

3. Because the burden of persuasion remains on the defendant, the responsibility "shifted" to the plaintiff is rather small, as he or she must simply produce some evidence to support his or her claim that a statutory exception applies. *Cf. St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, —— –

tiffs in this case do not challenge KEB and Industrial Bank's status as "agencies or instrumentalities of a foreign state" under § 1603(b), the defendants have established a *prima facie* case of immunity under the FSIA.

**b.** *Plaintiffs' burden of production:*

The plaintiffs attempt to meet their burden of production as to each of their claims by arguing that KEB and Industrial Bank fall victim to the "commercial activity" exception to the FSIA, which provides that

> "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign states elsewhere and that act causes a direct effect in the United States."

28 U.S.C. § 1605(a)(2). The defendants argue that no such exceptions are applicable to this case. Each of their three claims will be discussed in turn.

*1) Count I:*

As to Count I, which involves Longreen's alleged fraudulent transfers of proceeds through the Korean banks, the plaintiffs argue that KEB and the Industrial Bank, through their banking activities, engaged in commercial activity both within and outside of the United States in violation of each of the three clauses of § 1605(a)(2). For example, they "drafted, and issued, the bills of exchange [4] which they turned over to the Los Angeles Banks for collection obligating the US importers to pay sums to the Korean

banks, [and] required payment to be made through their branch (KEB's New York branch) and correspondent (the Industrial Bank's correspondent bank, Bankers Trust) banks in New York, ... which would (presumably) remit the proceeds to Korea." Moreover, the plaintiffs argue, "the fraudulent acts themselves [by Longreen] occurred in the United States ... and the KEB's and the Industrial Bank's frequent use of the United States court system when their own rights are at stake belies any claim of immunity." According to the plaintiffs, these acts disqualify KEB and the Industrial Bank from immunity under each clause of the "commercial activities" exception of the FSIA.

The plaintiffs first claim that KEB and the Industrial Bank fall "within the first clause of the 'commercial activity' exception" of the FSIA, which precludes immunity "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). The phrase "commercial activity carried on in the United States by the foreign state," in turn, is defined as "commercial activity carried on by such state and having substantial contact with the United States." *Id.* at § 1603(e). For the Court to have jurisdiction in this case based on clause one, therefore, the plaintiffs' action must meet three requirements: it must "be 'based upon' some 'commercial activity' by [the defendants] that had 'substantial contact' with the United States within the meaning of the Act." *Nelson,* 507 U.S. at ——, 113 S.Ct. at 1477. *Accord Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1018 (2nd Cir.1991) (noting that courts should "focus not on whether the foreign state generally engages in commercial activity in the United States, but on whether the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States"); *Gerding,* 943 F.2d at 526 (noting that "[i]n addi-

---

——, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993) (discussing the burden-shifting approach used in Title VII cases); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, (1981); *Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994).

**4.** Black's Law Dictionary 149 (5th ed. 1979) defines a "bill of exchange" as

> "[a] three party instrument in which first party draws an order for the payment of a sum certain on a second party for payment to a third party at a definite future time. Same as 'draft' under the U.C.C. A check is a demand bill of exchange."

tion to the express requirement that the commercial activity have 'substantial contact' with the United States, the FSIA has been interpreted to also require a nexus between the commercial activity in the United States and the plaintiff's cause of action"); *Rush–Presbyterian–St. Luke's Medical Ctr. v. Hellenic Republic,* 877 F.2d 574, 577 (7th Cir. 1989) (finding that, in order to determine immunity, "we must answer two related questions: (1) did the defendants engage in a 'commercial activity' in the United States or abroad?; and (2) if so, does this activity bear a significant relation to the United States, and is plaintiffs' action 'based upon' the defendants' commercial activity?").

■ Only a portion of the conduct alleged by the plaintiffs against KEB and the Industrial Bank under Count I of the Complaint meets the first prong of this test. The Seventh Circuit has interpreted the term "based upon" to require "an 'identifiable nexus' between the claim and the commercial activity at issue." *Santos,* 934 F.2d at 892. *See also Tubular Inspectors, Inc. v. Petroleos Mexicanos,* 977 F.2d 180, 183–84 (5th Cir.1992) (noting that "the jurisdictional nexus requirement of § 1605(a)(2) mandates not only that [the defendant's] commercial acts be tied to the United States, but that they form the basis of [the plaintiff's] causes of action"); *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989) ("[t]here must be a nexus between the defendant's commercial activity in the United States and the plaintiff's grievance"). As deduced in *Santos:*

> " . . . [W]hat level of 'nexus,' 'bond,' 'link,' or 'connection' is necessary[?] We conclude that a claim is 'based upon' events in the United States if those events establish a legal element of the claim . . .
>
> This approach follows the plain language of the Immunities Act. Again, the Act states that United States courts have jurisdiction in any case in which 'the *action* is based upon' certain events. 28 U.S.C. § 1605(a)(2) (emphasis added). An action is based upon the elements that prove the claim, no more and no less. If one of those elements consists of commercial activity within the United States or other conduct

specified in the Act, this country's courts have jurisdiction."

*Santos,* 934 F.2d at 893 (citations omitted).

In Count I of the Complaint, the plaintiffs claim that Longreen fraudulently transferred funds from the United States through KEB and the Industrial Bank to Korea in order to frustrate the plaintiffs' collection of judgment. The only action taken by these banks which could be deemed relevant to the Complaint, then, are those which may have helped to effectuate this transfer. As suggested by the banks, the mere fact that each has on occasion brought suit in this country or engaged in general commercial activity here does not provide an element underlying the plaintiffs' fraudulent transfer claim, *see, e.g., Shapiro,* 930 F.2d at 1018 (indicating that a foreign state's filing of two prior actions in federal court for the return of notes it had issued were "distinct from the instant litigation," which involved a bona fide purchaser's attempt to collect on one such note) *and Gerding,* 943 F.2d at 527 (noting that "the connection between the cause of action and the sovereign's commercial acts in the United States must be *material,*" and that "[i]solated or unrelated commercial actions of a foreign sovereign in the United States are insufficient to support a commercial activities exception to sovereign immunity"); and any fraudulent acts committed by Longreen itself, irrespective of whether or not they occurred in the United States, cannot be attributed to KEB or the Industrial Bank to provide this nexus. The only commercial activity by the banks cited by the plaintiffs as a basis for their fraudulent transfer claim is (1) their issuance through the Los Angeles Banks of the bills of exchange creating the debt obligations of MAI, Conpro, Inc., and other US importers through which Longreen allegedly funnelled its payments to Korea, and (2) their receipt of such payments through branch and correspondent banks in New York. Their attempt to apply clause one of the commercial activities exception, then, must rely upon these acts.

■ Moving to the second element in establishing a clause one exception, we have little difficulty concluding that these acts constitute "commercial activity." The FSIA de-

fines "commercial activity" as behavior exhibiting "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). While this definition "is not especially helpful, and is in fact somewhat circular," courts have developed, "through an evolving body of case law, a workable definition of a 'commercial activity.'" *Rush–Presbyterian,* 877 F.2d at 577. As indicated by the plaintiffs, the Supreme Court has concluded that, "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 613, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992) (finding foreign state's unilateral refinancing of bonds it had issued under a plan to stabilize its currency to be "commercial activity" under the FSIA). Put differently, a foreign state engages in commercial activity "where it exercises 'only those powers that can also be exercised by private citizens'" as opposed to "'powers peculiar to sovereigns.'" *Nelson,* 507 U.S. at ——, 113 S.Ct. at 1479 (*quoting Weltover,* 504 U.S. at 613, 112 S.Ct. at 2166). *Accord Rush–Presbyterian,* 877 F.2d at 578–80. In this case, there is little doubt that KEB and the Industrial Bank's role as conduits for money transfers between the United States and the Republic of Korea could have been, and in fact were, performed by privately-held financial institutions, and neither required nor implicated any powers of self-government. Therefore, Count I of the Complaint alleges "commercial activity" as defined by the FSIA.

The remaining question, then, is whether KEB and Industrial Bank, through their role in facilitating Longreen's transfer of funds to Korea, had "'substantial contact' with the United States within the meaning of the Act." *Nelson,* 507 U.S. at ——, 113 S.Ct. at 1477. Based on the record as it currently stands, we must answer this question in the affirmative. Case law giving content to the term "substantial contact" is admittedly scarce, as "Congress left it to the courts to define the contours of 'substantial contact' between a foreign state's commercial activity and the United States." *Shapiro,* 930 F.2d

at 1019. With little case law to guide them, several Circuits have nevertheless concluded that "Congress intended a tighter nexus than the 'minimum contacts' standard for due process." *Id.; accord Gerding,* 943 F.2d at 527; *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1513 (D.C.Cir.1988). Each of these courts also turned to the legislative history, which gives several examples of what is meant by "substantial contact":

> "cases based on commercial transactions performed in whole or in part in the United States, import-export transactions involving sales to, or purchases from, concerns in the United States, business torts occurring in the United States [ ], and an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States—for example, loans, guarantees or insurance provided by the Export–Import Bank of the United States ... This definition, however, is intended to reflect a degree of contact beyond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff ..."

*Gerding,* 943 F.2d at 527; *Zedan,* 849 F.2d at 1513. "Nothing in the legislative history suggests, however, that Congress intended jurisdiction under the first clause to be based upon acts that are not themselves commercial transactions, but that are merely precursors to commercial transactions." *Zedan,* 849 F.2d at 1513.

Ascertaining the type and number of contacts with the United States necessary to meet the "substantial" threshold in any particular case is a fact-specific inquiry; it is nevertheless helpful to review the decisions of other courts addressing this issue. In neither *Gerding* nor *Zedan* did the reviewing court find "substantial contact" between the commercial acts of the foreign sovereign and the United States. In *Gerding,* AT & T entered into an agreement with the Compania Telefonica Nacional de Espana ("Telfonica"), a Spanish corporation, to replace an undersea fiber optic deep water cable system it had previously sold which had failed because it could not withstand shark bites.

*Gerding,* 943 F.2d at 523. Telfonica procured a French ship, the N/C Leon Thevenin, which was owned by France Cables et Radio, for the mission; AT & T assigned Leslie Gerding from its research and development branch to work on the project. *Id.* Gerding, a diabetic, died aboard the ship; her estate brought suit against the French entities. *Id.* at 524. The Fourth Circuit found, *inter alia,* that the mere fact that Jean Genoux, the person heading the mission, had attended a planning meeting at AT & T's New Jersey office and that the ship had been on standby status in Wilmington, Delaware were not sufficient to show "substantial commercial activity of the French defendants within the United States" because the "actual commercial activity being planned" took place between Spain and the Canary Islands. *Id.* at 527. *See also Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1109 (D.C.Cir.1982), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983) (concluding that "substantial contact" requirement was not met where a representative of the foreign sovereign engaged in two business meetings with the plaintiff in the United States). In *Zedan,* in turn, an American citizen sued Saudi Arabia after it refused to pay him money due him under a road construction contract it had guaranteed. *Zedan,* 849 F.2d at 1512. The parties agreed that Saudi Arabia was immune from suit unless a single telephone call placed to him prior to the project by a Saudi Arabian official constituted a "substantial contact" with the United States. *Id.* at 1512–13. Characterizing this communication as a "recruiting phone call," rather than a contractual agreement, the D.C. Circuit found clause one of the commercial activities exception to the FSIA inapplicable. *Id.* at 1513.

In *Shapiro,* on the other hand, the Second Circuit found "substantial contact" between the defendant's commercial activity and the United States. The plaintiff in *Shapiro,* a United States citizen living in Hong Kong, claimed to be a bona-fide third party purchaser of a negotiable promissory note issued by the Republic of Bolivia to International Promotions and Ventures, Ltd. ("IPVL"), a United States corporation. *Shapiro,* 930 F.2d at 1014–16. Bolivia refused to honor the note because IPVL had failed to return it and other notes after failing to perform on the parties' aircraft contract as previously agreed, which caused Bolivia to sue IPVL in two separate federal court actions. *Id.* The Second Circuit rejected the plaintiff's theory the Bolivia waived its right to immunity by utilizing United States courts to sue IPVL. *Id.* at 1017–18. Nevertheless, the court relied on the following facts in establishing "substantial contact":

"Appellees [Bolivia] issued the Notes to IPVL, a Delaware corporation doing business principally in New York City. [The Notes] physically traveled to the United States and were placed in escrow for IPVL with a Washington, D.C. law firm. At this time, IPVL and Tractman were registered agents of the Government of Bolivia, in part for the purpose of arranging financing to purchase the Starfighters for that client. Although IPVL was obligated to return the Notes if the Starfighters were not delivered, the Notes were fully negotiable instruments on which Bolivia would be liable to any holder in due course.

The activity in question thus introduced negotiable promissory notes into the United States for the purpose of raising capital. There was no attempt to prevent IPVL from seeking to distribute the Notes in the United States apart from the Contract which did not purport to limit where the Notes might be discounted and the terms of which were, in any event, not on the Notes ... The issue [ ] is the nature of the activity engaged in by Bolivia, namely, raising capital by introducing negotiable promissory notes into the United States. We know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA. The very presence of such highly transferrable instruments, whether or not the initial holder successfully discounts them in the country, suffices to satisfy the 'substantial contact' requirement of the statute."

*Id.* at 1019 (citation omitted).

■ The acts taken by KEB and the Industrial Bank in the instant case better

resemble those of the defendant in *Shapiro* than those of the defendants in *Zedan* and *Gerding*.[5] While the bills of exchange issued by the banks were presumably not negotiable, they physically traveled to the United States, where they were received by the Los Angeles Banks, which are apparently incorporated under U.S. law and exist as domestic corporations. The bills of exchange obligated U.S. importers to make payment for goods received from MJ Korea from their domestic bank accounts to Korean banks; those targeted to KEB were to be sent to its New York branch office, and those earmarked for the Industrial Bank were to be made to Bankers Trust in New York. The mere fact that payment occurred through intermediaries does not absolve the banks of responsibility; a foreign state can, in appropriate circumstances, surrender immunity through commercial activities committed by its agent on its behalf. *See Maritime*, 693 F.2d at 1105 (noting that the legislative history of clause one "suggests that a foreign state, in Congress's view, can surrender immunity by virtue of activities committed by an agent, and that, consequently, the 'carried on by' requirement can be interpreted in light of broad agency principles").

KEB and the Industrial Bank financed these transactions fully aware that the goods would be traveling to the United States to domestic purchasers, that the purchasers would draw upon their domestic accounts to render payment, and that payment would be channeled through domestic banks to Korea. According to the plaintiffs, they then accepted payment from Longreen to settle these accounts. In our view, the banks' role in arranging and accepting the money transfer from this country to Korea in order to facilitate the import of goods provided "sufficient contact" with the United States to satisfy the requirements of the FSIA. Based on the facts presented thus far, we believe that this conclusion is founded on the fairest reading of the statute and best serves the previously-discussed "restrictive theory" of immunity underlying its enactment. For this reason, and because the claim contained in Count I are "based upon" the banks' "commercial activity," we conclude that the plaintiffs have met their burden of production as to such count, and that the defendants have not established that clause one of the "commercial activities" exception does not apply. As a result, KEB and the Industrial Bank are not immune from suit, and this Court has subject matter jurisdiction over Count I of the Complaint.[6]

5. The defendants argue that "[t]he case whose facts came closest to those in this case is *International Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8 (2nd Cir.1989)"; the court in that case, however, addressed the third, rather than the first, clause of the "commercial activities" exception to the FSIA.

6. For the same reasons, we think it clear that KEB and the Industrial Bank's issuance and delivery of the bills of exchange to the United States and receipt of funds in the United States qualify as "act[s] performed in the United States in connection with a commercial activity of the foreign state elsewhere," thereby allowing the plaintiffs to invoke the rarely-discussed clause two "commercial activities" exception to the FSIA.

Clause three of this exception, which precludes immunity in cases "in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" seems likewise applicable. KEB and the Industrial Bank ultimately transferred the funds received from Longreen to Korea. As previously indicated, the plaintiffs' lawsuit is based on this and other acts relating to the import financing provided by the banks; and it seems obvious that, because we have already found that the banks engaged in "commercial activity" through such acts, they are "connected with" commercial activity. *See Nelson*, 507 U.S. at ——, 113 S.Ct. at 1478 (recognizing that "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity [clause one] and one 'based upon' acts performed 'in connection with' such activity [clauses two and three]," and that "[t]he only reasonable reading of the former term calls for something more than a mere connection with, or relation to, commercial activity").

The primary issue under clause three, then, is whether such acts, to the extent they were committed outside this country, caused a "direct effect" in the United States. The Supreme Court has "considered the meaning of the phrase 'direct effect' and defined it succinctly but clearly: '[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'' " *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C.Cir.1994) (*quoting Weltover*, 504 U.S. at 617, 112 S.Ct. at 2168). This

*2) Count II:*

As previously indicated, the plaintiffs claim in Count II of the Complaint that, because the over $8 million in Korean real estate and other property pledged by the Han defendants to the Korean bank defendants to secure financing for MJ Korea "was part of the equity investment of the owners of MJ Korea [ ] and constitutes an asset of MJ Korea properly subject to execution," the Court should order the Korean bank defendants to "liquidate the collateral and [ ] deposit the proceeds in the Eastern District of Wisconsin for garnishment." They argue that the Korean banks' "refusal to liquidate the Korean collateral and return funds previously transferred to them in violation of the Court's extant freeze orders" is an "act that causes a direct effect in the United States," and therefore precludes them from asserting immunity pursuant to clause three of the "commercial activities" exception of the FSIA.

The plaintiffs have satisfied their burden of producing evidence to support their non-immunity claim; however, KEB and the Industrial Bank have met their burden of persuasion by establishing the inapplicability of clause three of the "commercial activities" exception to the claims alleged in Count II. As previously indicated, that provision waives immunity when the plaintiffs' action is *"based upon* ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). In Count II, the plaintiffs seek to enforce a judgment by requiring the Korean banks to foreclose on property allegedly owned by MJ Korea and/or the Han defendants. In order for this claim to be "based upon" the creation of these mortgage agreements in Korea, the latter must "establish a legal element of the claim." *Santos,* 934 F.2d at 893. *Accord Nelson,* 507 U.S. at ——, 113 S.Ct. at 1477 (noting that "the phrase ["based upon"] is read most naturally

to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case").

Setting aside for the moment the issue of subject matter jurisdiction over the Korean banks, the plaintiffs, in order to establish a right to initiate foreclosure, must prove that the property mortgaged by the Han relatives actually constituted an asset of judgment debtor MJ Korea, that they are unable to satisfy judgment from other assets, and that they have a priority or residual interest in such assets. It would be a far stretch to say that the plaintiffs' foreclosure claim is premised on the mere creation of the mortgage agreements themselves; rather, it seems clear that it is based upon the entry of default judgment against MJ Korea and the plaintiffs' inability to collect from other sources. As a result, KEB and the Industrial Bank's presumed immunity cannot be set aside under clause three of the "commercial activities" exception.

For similar reasons, the defendants have shown that, even assuming that the creation of these mortgage agreements was "connected with" commercial activity, *see Nelson,* 507 U.S. at ——, 113 S.Ct. at 1478 (recognizing that "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity [clause one] and one 'based upon' acts performed 'in connection with' such activity [clauses two and three]," with the former requiring a higher standard), it did not have a "direct effect" in the United States. The Supreme Court has "considered the meaning of the phrase 'direct effect' and defined it succinctly but clearly: '[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'" *Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1146 (D.C.Cir.1994) (*quoting Weltover,* 504 U.S. at 617, 112 S.Ct. at 2168). This rejected the definition previously adopted in this and other Circuits which was based on the legislative history of the FSIA: that a "direct effect" was one which was

rejected the definition previously adopted in this and other Circuits which was based on the legislative history of the FSIA: that a "direct effect" was one which was "substantial" and "foreseeable." *See, e.g., America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 798–800 (9th Cir.1989); *Rush–Presbyterian,* 877 F.2d at 581; *Maritime,* 693 F.2d at 1110–1111. In this case, the banks' transfer of the Longreen funds to Korea clearly had a direct effect in the United States; it hampered the plaintiffs' ability to collect on their $8 million judgment.

"substantial" and "foreseeable." *See, e.g., America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 798–800 (9th Cir.1989); *Rush–Presbyterian,* 877 F.2d at 581; *Maritime,* 693 F.2d at 1110–1111.

In this case, the creation of the mortgages did not have an immediate effect in the United States relevant to the collection of judgment; at the time these transactions occurred in Korea, default judgment had not yet been entered against MJ Korea and the plaintiffs had no right to seek recovery of assets. It was the default judgment entered against MJ Korea in April of 1994, and not the mortgage agreements entered into the previous year, which had the immediate consequence of initiating the plaintiffs' right to collect on assets located in the United States (and, perhaps, elsewhere). A contrary understanding would effectively emasculate the clause three exception by allowing plaintiffs to bootstrap its application; foreign states could be sued in the United States years after they have taken actions elsewhere which simply affect the balance sheet of an exporter so long as the exporter is later bound by a domestic judgment. Ratification of this type of lifelong marriage, as sought by the plaintiffs, would violate *Weltover* as well as the policies underlying the "restrictive theory" of immunity, which contemplates the lifting of immunity for foreign states only when they should be aware that their action will impact domestic concerns. KEG and the Industrial Bank, then, are immune from suit as to the claims brought by the plaintiffs in Count II of the Complaint.

### 3) *Count III:*

We previously saw that, in Count III of the Complaint, the plaintiffs claim that, if the Court does not find the $8 million in Korean real estate to be subject to execution, it should nevertheless require "equitable marshaling of the assets" by ordering the Korean bank defendants "to satisfy the total amount of the judgment debtors' obligations to them out of the collateral, and to turn over all remaining assets [ ] to the plaintiffs." Again, they argue that the Korean banks' "refusal to liquidate the Korean collateral and return

funds previously transferred to them in violation of the Court's extant freeze orders" is an "act that causes a direct effect in the United States," and therefore precludes them from asserting immunity pursuant to clause three of the "commercial activities" exception of the FSIA.

The plaintiffs have once again satisfied their burden of producing evidence to support their non-immunity claim; however, KEB and the Industrial Bank have met their burden of persuasion by establishing the inapplicability of clause three of the "commercial activities" exception to the claims alleged in Count III. As with Count II, Counts III is not premised on any activity taken by the Korean banks; rather, it is an attempt to enforce a judgment by requiring the Korean banks to either foreclose on property or turn over accounts and other assets of MJ Korea and/or the Han defendants. Therefore, for the reasons stated in the preceding section, it is not "based on" the mortgage transactions entered into by the Korean banks; nor did such transactions have a "direct effect" in the United States. As a result, KEG and the Industrial Bank, are again immune from suit as to the claims brought by the plaintiffs in Count III of the Complaint.

### 2. *Motion by the Korean banks to Dismiss Counts II and III:*

All of the Korean bank defendants join in arguing that the plaintiffs cannot succeed on Count II of the Complaint, the foreclosure claim, or Count III of the Complaint, the equitable marshaling claim, and that dismissal is therefore warranted.[7] First of all, they claim that the "local action" doctrine precludes this Court from exercising subject matter jurisdiction. Under this rule of law, "imported from the common law and now firmly established in federal jurisprudence," Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3822, at 204 (2nd ed. 1986), "federal and state courts lack jurisdiction over the subject matter of claims to land located outside the state in which the court sits." *Hayes,* 821 F.2d at 287. This is because such actions are deemed to be "local," rather

---

7. KEB and the Industrial Bank, of course, present this as an alternative ground for dismissal.

than "transitory," in nature. Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 202–04.

■ While "attempts to define the distinction between local and transitory actions have been notoriously unsuccessful," *id.* at 205, "the characterization of an action as local or transitory is a matter of *federal* rather than *state* law." *Kavouras v. Fernandez,* 737 F.Supp. 477, 478 (N.D.Ill.1989) (citing Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 207). In the "leading case" addressing this distinction, Chief Justice Marshall, while suggesting "that the line should be drawn between actions *in rem* and those *in personam,*" nevertheless "accepted the rule that 'actions are deemed transitory, where transactions on which they are founded, might have taken place anywhere; but are local where their cause is in its nature necessarily local.'" Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 203, 206 (*quoting Livingston v. Jefferson,* 15 Fed.Cas. 660, 664 (No. 8411) (C.C.D.Va.1811)). Based on the latter theory, the *Livingston* court found that, because a trespass to land in Louisiana can take place only in Louisiana, the plaintiff's *in personam* action for a money judgment against the defendant could only be brought in Louisiana. *Livingston,* 15 Fed. Cas. at 664. This result has been deemed "a triumph of sterile history over common sense," Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 206, and criticized by the Seventh Circuit, *see Raphael J. Musicus, Inc. v. Safeway Stores, Inc.,* 743 F.2d 503, 509–10 (7th Cir.1984); thus, we look to other federal cases to ascertain whether the plaintiffs' foreclosure and/or equitable marshaling claims are the type of actions that have been held to be local in nature. *See id.* at 209.

As noted by the Korean banks in their brief, the admittedly obscure but neverthe-

less longstanding local action doctrine was embraced by Judge Shadur of the Northern District of Illinois in a foreclosure action. *Kavouras,* 737 F.Supp. at 478. In *Kavouras,* the plaintiff filed a "self-prepared 'Complaint for Foreclosure and Fraudulent Conveyance'" against five defendants, seeking the return of mortgaged property located in Rusk County, Wisconsin. *Id.* at 477–78. Citing *Hayes,* Judge Shadur dismissed the action for lack of subject matter jurisdiction,[8] noting that "it has long been understood that mortgage foreclosure actions are classic examples of what have historically been characterized as 'local' as contrasted with 'transitory' actions [ ]—and federal jurisdiction over local actions involving real property exists *only* within the territorial boundaries of the state where the land is located." *Id.* at 478. *See generally* Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 209 & n. 29 (listing other cases in which an action to foreclose or cancel a mortgage has been held to be local in nature).

In Count II, the plaintiffs ask this Court to direct the Korean banks to foreclosure on Korean property (and to then deposit the proceeds in the Eastern District of Wisconsin for garnishment); as noted in *Kavouras,* this is a clear violation of the local action doctrine. The plaintiffs argue that this doctrine does not apply because they seek *in personam,* rather than *in rem,* relief; that is, they ask the Court to "order the Korean banks, over whom the Court has personal jurisdiction, [ ] to liquidate the Korean collateral in a commercially reasonable fashion and in accordance with the laws of the Republic of Korea." Black's Law Dictionary defines an "action *in rem*" as

"a proceeding that takes no cognizance of owner but determines right in specific property against all of the world, equally binding on everyone. It is true that, in a strict sense, a proceeding *in rem* is one

8. "It is not clear whether the distinction between local and transitory actions runs to the jurisdiction or the venue of the federal courts"; cases have gone both ways. Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 206–07. In *Hayes,* the Fifth Circuit found that the local action doctrine effects subject matter jurisdiction. *See Hayes,* 821 F.2d at 286–88. The

latter approach, however, might well be favored, *see* Wright, Miller & Cooper, *Federal Practice and Procedure* § 3822, at 207, and has apparently been adopted by the Seventh Circuit, *see Musicus,* 743 F.2d at 506; nevertheless, because the defendants are clearly not willing to waive any defect in venue, this issue makes little practical difference in this case.

taken directly against property, and has for its object the disposition of property, without reference to the title of individual claimants; *but, in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property owned by them, or of some interest therein."*

Black's Law Dictionary 713 (5th ed. 1979) (emphasis added). Despite their rhetoric, the plaintiffs ask the Court in Counts II and III to order the foreclosure of foreign property to satisfy judgment, which would require us to make title and priority determinations in order to determine rights of recovery. The *in rem* nature of such action is undeniable, and cannot be shielded under the cloak of personal jurisdiction; for if the Court were to grant the relief requested in Counts II and III, we would be required to directly order the conveyance and termination of the Korean banks' interest in property. The local action doctrine precludes us from taking such measures in order to provide relief.

In support of their position, the plaintiffs cite *Musicus,* a Seventh Circuit opinion written by Judge Cudahy. In *Musicus,* the plaintiff sued the defendant over the alleged breach of lease agreements involving property in Nebraska and Montana, seeking to void the leases. *Id.* at 505. Characterizing the suit as one involving "allegations of breach of contract, fraud and trespass," Judge Cudahy found the local action doctrine inapplicable, and held that the Northern District of Illinois could exercise proper venue.[9] *Id.* at 505–06. In doing so, he observed:

> "Proper venue is determined by the characterization of the action as either local or transitory—a determination which, in turn, depends on the type of relief sought ... The traditional and well-established distinction [ ] is the same as that between *in personam* and *in rem* jurisdiction. The reason for this parallel is simply that, in order to provide *in rem* relief, the court must have jurisdiction over the real prop-

erty at issue, and a local action must therefore be brought in the jurisdiction in which that real property is located. On the other hand, to provide *in personam* relief, the court need only have personal jurisdiction over the defendant, and thus a transitory action may be brought in any jurisdiction in which the defendant can be found."

*Id.* at 506–07 (citations omitted). Judge Cudahy further noted, however, that when a "plaintiff seeks a personal judgment which will ultimately affect real property," such action may be considered *in personam,* and therefore transitory in nature, only if it "is based in fraud, trust, or contract." *Id.* at 507. According to Judge Cudahy, this principle applies "even to suits for specific performance of contracts where the subject of the contract is real property *except when the court's decree would itself operate as a conveyance of the property." Id.* (emphasis added).

▮ In Counts II and III of the Complaint, the plaintiffs do not seek to impose personal liability on the defendants based upon their breach of any contractual or other type of duty; as previously indicated, the plaintiffs instead desire a Court order requiring the defendants to foreclosure on foreign property. It is our view that *Kavouras,* rather than *Musicus,* is the applicable authority, and more in line with the policy reasons underlying the local action doctrine. In order to allow the plaintiffs to advance under Counts II and III, the Court would be required to extend the bounds of the local action doctrine beyond the standards adopted by the Seventh Circuit in *Musicus;* the plaintiffs cite no authority which convinces us of the propriety of doing so. Moreover, in cases such as this which involve international jurisdiction, matters of comity make us take the most prudent approach. The plaintiffs' remedy as to the foreclosure of Korean property lies in Korean courts; as a result, Counts II and III must be dismissed.[10]

**9.** *See id.*

**10.** Pursuant to this decision, the Court need not determine whether the plaintiffs can meet the standard required for postjudgment injunctive

relief for Count II or whether the plaintiffs have alleged facts sufficient to state a claim for equitable marshaling.

## IV. *SUMMARY*

For the foregoing reasons, KEB and Industrial Bank's Motion to Dismiss the Complaint pursuant to Rule 12(b)(1) in the above-captioned matter is hereby **GRANTED** as to Counts II and III of the Complaint and **DENIED** as to Count I, and the Korean bank's Motion to Dismiss Counts II and III of the Complaint pursuant to Rules 12(b)(1), (3), and (6) in the above-captioned matter is hereby **GRANTED.**

**SO ORDERED.**